STRIP CLEAN FLOOR REFINISHING
et al., Plaintiffs,

v.

NEW YORK DISTRICT COUNCIL NO.
9 BROTHERHOOD OF PAINTERS
et al., Defendants.

No. 70-C-1467.

United States District Court,
E. D. New York.

Nov. 9, 1971.

Gutterman & Pollack, Valley Stream, N. Y., for plaintiffs.

Easton & Echtman, New York City, for defendant N. Y. District Council No. 9 and defendant Locals No. 51, 121, 261, 442, 454, 472, 490, 504, 645, 759, 803, 848, 874, 892, 905, 977, 1011, 1035, 1456 and 1511.

Ashe & Rifkin, New York City, for defendant Locals No. 206, 806 and 1087.

Waldman & Waldman, New York City, for defendant Local No. 230.

Eisner & Levy, New York City, for defendant Local No. 829.

## DECISION

TRAVIA, District Judge.

Plaintiffs move for summary judgment on the issue of liability and for a trial on the issue of damages only.

The plaintiffs, Strip Clean Floor Refinishing and Painting Corporation ("Strip Clean") and Delta Contracting Corporation ("Delta"), are New York corporations engaged in commercial painting and contracting.

The defendants include New York District Council No. 9, Brotherhood of Painters, Decorators and Paperhangers of America, AFL–CIO, ("D.C.9") and twenty-six affiliated local unions, labor organizations which supply through their membership labor services to the commercial painting and contracting industry. The affiliates include six local unions characterized by the defendants as "autonomous locals" and twenty locals of a non-autonomous character.

The defendant D.C.9 and the twenty affiliate local unions, one of which, Local 1507, was not served and, therefore, not a party, which are not characterized as autonomous locals oppose the motion of the plaintiffs, and the so-called autonomous locals 206, 806, and 1087 oppose the plaintiffs' motion and, by formal motion, move for summary judgment dismissing the complaint against them.[1] The so-called autonomous locals 230, 829, and 1456 oppose the plaintiffs' motion and moved orally, without opposition at the time of argument, for summary judgment dismissing the complaint against them.

The complaint alleges that this action arises under the Labor Management Relations Act of 1947, 29 U.S.C. § 151 et seq. ("Act"). Plaintiffs allege that in the course of performing work for the

---

1. Locals 206, 806, and 1087 have filed with this Court a formal cross motion seeking summary judgment dismissing the complaint against them.

Board of Education of the City of New York ("B.O.E."), the plaintiffs employed members of a union unaffiliated with defendant D.C.9; that for periods throughout 1968, the defendants did partake in activity proscribed by the Act, threatening and restraining B.O.E. from doing business with the plaintiffs, and caused employees of B.O.E. and others engaged in commerce to strike and refuse to perform services for their employers; and that the activities of the defendants amounted to unfair labor practices which caused damage to the plaintiffs, entitling them to punitive and compensatory damages in the sum of $3,000,000. The plaintiffs also allege that, at all times relevant, D.C.9 did in fact act as agent for the defendant affiliates and that the defendant affiliates ratified all of the acts of D.C.9 upon which the complaint is based. The plaintiffs, also and more pertinent to the motions being considered, state in an affidavit by John Durandes, presently General Manager of Strip Clean *and* formerly General Manager of Delta, that as a result of the activities engaged in by the defendants, application was made by the plaintiffs herein to this Court in 1968 for injunctive relief against D.C.9; a simultaneous application was presented to the National Labor Relations Board ("N.L.R.B."); and after a hearing on the matter, this Court granted a temporary injunction staying the defendants[2] from engaging in proscribed acts against B.O.E., which stay was subject to the pending proceedings before the N.L.R.B. It is further stated that, thereafter, a hearing was held before a Trial Examiner of the N.L.R.B., and, after having made findings of fact and conclusions of law, the Trial Examiner determined that the defendant D.C.9 did engage in unfair labor practices violating Section 8(b) (4) (ii) (B) of the Act. Thereafter, the N.L.R.B. reviewed and affirmed the decision, findings, conclusions and recommendations of the Trial Examiner. The Circuit Court of Appeals, Second Circuit,

granted, upon review, enforcement of the order of the N.L.R.B.

It is these unfair labor practices on which the instant suit is based. The plaintiffs now argue that the doctrine of collateral estoppel applies in this case and that the plaintiffs are entitled to summary judgment in their favor on the issue of liability based on the decision of the N.L.R.B.

#### I.

■ Prior to 1966, the cases which dealt with the res judicata effect of administrative determinations on a subsequent suit at law held that res judicata could not be applied. In 1966, however, the Supreme Court, in United States v. Utah Construction and Mining Co., 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559, 16 L.Ed.2d 642 (1966), remarked that the prior holdings should not be accepted as dogma. The Court stated:

> "Occasionally courts have used language to the effect that res judicata principles do not apply to administrative proceedings, but such language is certainly too broad. When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose."

The question on this motion is, therefore, whether that principle can be applied in this case.

In this suit, the plaintiffs are seeking damages under the Labor Management Relations Act of 1947, and they invoke the jurisdiction of this Court because the cause of action arises thereunder. They do not specify the particular section of the Act which confers jurisdiction; however, it is section 303 of the Act, 29 U.S.C. § 187, which states:

> "(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce,

---

2. The only party defendant in that proceeding was D.C.9.

for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158 (b) (4) of this title.

(b) Whoever shall be injured in his business or property by reason or[1]

1. So in original. Probably should read 'of.'

any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

There have been labor cases involving the application of res judicata after an administrative determination based on § 303 of the Act since 1966, some somewhat similar to the instant case.

The United States Court of Appeals for the Fifth Circuit, in Painters District Council 38 v. Edgewood Contracting Co., 416 F.2d 1081 (1969), determined that res judicata would apply to a proceeding of this nature. The *Edgewood Contracting* case involved an employer seeking damages after it had been determined by the N.L.R.B. that the defendant had committed an unfair labor practice by conducting a secondary boycott against the plaintiff with the intent to force the plaintiff to cease using *non-union* subcontractors. There the plaintiff moved for partial summary judgment on the issue of liability and the district court granted it on the grounds that the N.L.R.B. determination was res judicata on the issue of liability. The Court of Appeals in affirming the lower court based their decision on *Utah Construction, supra,* and the reasoning of Professor Davis. *See* 2 K. Davis, Administrative Law, § 18.12 (1965).[3] The Court stressed that the district court had determined that the N.L.R.B. had

3. Davis' treatise was supplemented in 1970 and contains a thorough treatment of the issue in question. *See* K. Davis, Admin-

conducted a full hearing, with the parties represented by counsel, and with full opportunity to present evidence and to call, examine, and cross-examine witnesses. Both parties also made oral arguments. It was also noted that the N.L.R.B. was acting in a judicial capacity and that factual issues were properly before it. Moreover, the union made no claim that it was denied a full or fair hearing or that the action by the N.L.R.B. was arbitrary or capricious or that the determination was unsupported on the record as a whole. Finally, the court, quoting from the District Court opinion, stated that:

"[It] should not 'perpetuate the possibility of inconsistent holdings *resulting from dual litigation of the same issues between the same* parties.'" (416 F.2d at 1083). (Emphasis added).

As will be discussed hereinafter, *dual litigation of the same issues between the same parties* does not exist in the case at bar.

The Court of Appeals, Fifth Circuit, again in H. L. Robertson & Associates, Inc. v. Plumbers Local 519, 429 F.2d 520 (1970), a case which appears to be virtually on all fours with the case now before this Court, held that a determination of the N.L.R.B. was res judicata on the issue of liability. It based its decision on the *Edgewood Contracting* case, *supra,* and stated:

" * * * the record in this case shows that the Board *conducted a full hearing on the issue of the legality vel non of Local 519's activities at the job site, with the present parties represented at that hearing by counsel.*" (429 F.2d at 521). (Emphasis added).

The plaintiffs also cite the case of Paramount Transport Systems v. Teamsters Local 150, 436 F.2d 1064 (9th Cir. 1971), which appears to be identical to the instant one. In affirming a district court application of the doctrine of res

istrative Law, §§ 18.01–18.12 (Supp. 1970).

judicata the Court of Appeals, Ninth Circuit, stated:

"We believe that the district court correctly applied United States v. Utah Construction & Mining Co., supra, to foreclose the union from litigating in this action those material issues of fact decided adversely to it in the proceedings culminating in a final order by the National Labor Relations Board. But we do not construe Utah Construction to require that the doctrine of collateral estoppel be applied across the board to all determinations of such issues by administrative agencies. Reading Utah Construction with United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), *we conclude that collateral estoppel effect should be given only to those administrative determinations that have been made in a proceeding fully complying with the standards of procedural and substantive due process that attend a valid judgment by a court and further, that such effect should be accorded only to those findings upon material issues that are supported by substantial evidence on the administrative record as a whole.*" (436 F.2d at 1065, 1066). (Emphasis added).

Both the *H. L. Robertson* and the *Paramount Transport* cases, *supra,* are distinguishable from the case before this Court as will be discussed hereinafter.

It would seem that there exists an abundance of authority supporting the plaintiffs' motion.

The plaintiffs, however, fail to mention a case quite similar to the instant one decided in this District in 1968. That case, Old Dutch Farms, Inc. v. Milk Drivers Local 584, 281 F.Supp. 971 (E.D. N.Y.1968), (Mishler, J.), involved an employer suit for damages resulting from union activity determined by the N.L. R.B. to have been an unfair labor practice. On a motion for summary judgment on the issue of liability, the Court denied the motion. Judge Mishler presented a thorough treatment of the issue

involved, discussing arguments made by the opposing sides. He stated:

"Where there is some good reason for a new judicial inquiry into the same facts, however, the courts will not view the administrative findings as final. See, United States v. Utah Const. & Mining Co., supra at 421 n. 18, 86 S.Ct. at 1559 n. 18. Indeed, they appear in accord with Professor Davis's view that the doctrine of *res judicata* should be used when the reasons for it are present in full force, modified when such modification is needed, and rejected when the reasons against its use outweigh those in its favor. 2 Davis, Administrative Law § 18.02 at 548 (1958)." (281 F.Supp. at 974).

He determined that the issue involved in the motion was whether there was some factor present in the prior proceedings or the nature of an action under § 303 which would militate against the application of the doctrine. He concluded not only that there were factors present in the prior proceeding which militated against res judicata (substantial factual issue remained unresolved) but also that the particular nature of suits under § 303 prevented the use of res judicata. He stated that:

"Section 303, in opening up hot cargo agreements, secondary boycotts and work assignments to the district courts, represents a substantial exception to the N.L.R.B.'s primary jurisdiction over unfair labor practice proceedings. * * * Actions commenced under this section are considered entirely separate from cases that arise out of the same labor dispute but brought before the N.L.R.B. * * *." (281 F.Supp. at 974–975).

He relied on two Supreme Court cases: International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952) and N. L. R. B. v. Radio & Television Broadcast Engineers Union, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

In *Juneau Spruce*, it was stated:

"Section 8(b) (4) (D) and § 303(a) (4) are substantially identical in the conduct condemned. Section 8(b) (4) (D) gives rise to an administrative finding; § 303(a) (4), to a judgment for damages. *The fact that the two sections have an identity of language and yet specify two different remedies is strong confirmation of our conclusion that the remedies provided were to be independent of each other. Certainly there is nothing in the language of § 303(a) (4) which makes its remedy dependent on any prior administrative determination that an unfair labor practice has been committed. Rather, the opposite seems to be true.* For the jurisdictional disputes proscribed by § 303(a) (4) are rendered unlawful 'for the purposes of this section only,' thus setting apart for private redress, acts which might also be subjected to the administrative process. The fact that the Board must first attempt to resolve the dispute by means of a § 10(k) determination before it can move under § 10(b) and (c) for a cease and desist order is only a limitation on administrative power, as is the provision in § 10(k) that upon compliance 'with the decision of the Board or upon such voluntary adjustment of the dispute,' the charge shall be dismissed. These provisions, limiting and curtailing the administrative power, find no counterpart in the provision for private redress contained in § 303(a) (4). Section 303(a) (4) as explained by Senator Taft, its author, 'retains simply a right of suit for damages against any labor organization which undertakes a secondary boycott or a jurisdictional strike.'" (342 U.S. at 243, 244, 72 S.Ct. at 239). (Emphasis added).

In *Radio and Television Broadcast Engineers,* the Supreme Court stated:

"A second inconsistency is urged with § 303(a) (4) of the Taft-Hartley Act, which authorizes suits for damages suffered because of jurisdictional strikes. The argument here is that since § 303(a) (4) does not permit a union to establish, as a defense to an action for damages under that section, that it is entitled to the work struck for on the basis of such factors as practice or custom, a similar result is required here in order to preserve 'the substantive symmetry' between § 303(a) (4) on the one hand and §§ 8(b) (4) (D) and 10(k) on the other. This argument ignores the fact that this Court has recognized the separate and distinct nature of these two approaches to the problem of handling jurisdictional strikes. *Since we do not require a 'substantive symmetry' between the two, we need not and do not decide what effect a decision of the Board under § 10(k) might have on actions under § 303(a) (4)."* (364 U.S. at 584, 585, 81 S.Ct. at 337). (Emphasis added).

Another case relied on was Kipbea Baking Co. v. Strauss, 218 F.Supp. 696, 700 (E.D.N.Y.1963) (Bartels, J.), wherein it was stated:

"The facts set forth in the complaint, however, do describe secondary boycott activities and other acts which are expressly prohibited by Section 8 (b) (4) of the Act. Apparently defendants admit that the acts charged would be such a violation since the character of these acts was the basis of their thesis that the NLRB had exclusive jurisdiction of this suit. The coordinate section of the Act expressly authorizing suits for the recovery of injuries sustained by such prohibited acts, is Section 303 of the Act. *A Section 303 suit is not dependent upon a prior administrative determination by the Board that an unfair labor practice has been committed by either the employer or the union.* See International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 1951, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275. *Since the two actions are independent, it is apparently of no consequence that a decision reached by the Board in one case is inconsistent with the decision reached by the court*

*in the other case.*" (Emphasis added).

Judge Mishler also noted that "Not only are inconsistent decisions by Board and court possible, but they have in fact been rendered."[4] He concluded that:

"Acquiescence in or approval of such results indicates that the courts feel that the congressional scheme of parallel enforcement of section 8(b)(4) violations by the courts and the Board precludes reliance upon *res judicata* or collateral estoppel based upon the findings of either fact finder." (281 F.Supp. at 975).[5]

Finally, the Court cited a footnote from the decision of the Court of Appeals, Second Circuit, in Old Dutch Farms, Inc. v. Milk Drivers Local 584, 359 F.2d 598, 602–603 n. 7 (1966), involving a prior ancillary proceeding in the same case, wherein it was stated:

"Prior to the commencement of this action, the NLRB determined that the union had violated § 8(b)(4) of the NLRA. It should be noted, however, that a prior determination by the Board is not a prerequisite to an action by an employer under § 303. The administrative and judicial actions and remedies are viewed as entirely independent, i. e., § 303 suits constitute a clear exception to the exclusive jurisdiction of the NLRB over alleged unfair labor practices. E. g., International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952); Note, 40 Ind.L.Rev. 55 (1964); see Local 20, Teamsters, etc. v. Morton, 377 U.S. 252, 258–259 n. 13, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); Sovern, Section 301 and the Primary Jurisdiction of the NLRB, 76 Harv.L.Rev. 529, 549–550 (1963). *Moreover, an administrative determination, such as the one involved here, does not bind the court confronted with the question of whether particular union activity violated § 8(b) (4) in a § 303 suit.* Compare NLRB v. Deena Artware, Inc., 198 F.2d 645 (6th Cir. 1952), cert. denied, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342 (1953), with United Brick & Clay Workers of

4. *Compare* NLRB v. Deena Artware, Inc., 198 F.2d 645 (6th Cir. 1952), cert. denied, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342 (1953), *with* United Brick & Clay Workers v. Deena Artware, Inc., 198 F. 2d 637 (6th Cir.), cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952), in which the court of appeals said:
We recognize that this finding is contrary to the finding in the companion case of N.L.R.B. v. Deena Artware, Inc., No. 11156, supra, in which the Trial Examiner found that the picketing of the area of construction which caused the cessation of work by the general contractors was on the part of the Teamster's Union and not by the Appellants, which finding we have upheld and on which we have based a ruling in that case. Under our existing system of courts, juries, administrative agencies, and appellate review, such findings, even though inconsistent, are not invalid, and one does not destroy the other. The two proceedings, even though arising out of the same labor dispute, were heard by separate fact finding agencies. The witnesses in the two proceedings were not the same. The cross-examination of some witnesses who testified in both proceedings was not by the same attorneys. Necessarily the evidence produced in the different proceedings by such testimony was not identical. Each fact finding agency was entitled to make its own decision upon the evidence before it. Though this Court on review recognizes the inconsistency, and may not be in accord with one of the two rulings if it was making the ruling as a matter of original jurisdiction, it does not have the right to set aside such ruling, if, in the case of the jury verdict, it is supported by substantial evidence, or, in the case of the Labor Board proceeding, it is supported by substantial evidence on the record considered as a whole. In our opinion, the respective findings are so supported in each of the two proceedings. (198 F.2d at 642, 643).
*See also* Sovern, Section 301 and the Primary Jurisdiction of the NLRB, 76 Harv.L.Rev. 529, 549, 550 (1963).

5. A case note in a law review wherein the writer suggested that Congress may have felt that a union is more likely to be deterred from engaging in unlawful activity if it must win both before the court and the Board was also cited. Note, Damages for Unfair Labor Practices, 40 Ind.L.J. 37, 56 (1964).

America v. Deena Artware, Inc., 198 F.2d 637 (6th Cir.), cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952)." (Emphasis added).

■ Therefore, Judge Mishler concluded that the peculiar nature of § 303 suits precluded the application of res judicata principles therein after a prior administrative determination. However, there existed an additional argument on which the decision was based: there remained to be tried substantial factual issues—issues which were not resolved in the administrative proceeding.[6] In the instant case, there also remain factual issues of substantial importance. The N.L.R.B. proceeding which concluded in the determination sought to be given res judicata effect herein involved only D.C. 9; none of the affiliates were parties thereto. It is alleged that D.C.9 was acting as agent for the affiliates in those activities which gave rise to this suit and that the affiliates did in fact ratify the actions of D.C.9. However, these are significant issues of fact pertinent to the issue of liability which were left unresolved by the N.L.R.B. Since this Court is bound to apply res judicata only where there is a possibility of inconsistent holdings resulting from dual litigation of the same issues between the same parties, the N.L.R.B. determination is not binding on this Court, especially in light of the fact the twenty-six affiliates were not parties to the N.L.R.B. proceeding, six of which present a unique question to be discussed herein.[7]

This Court finds the reasoning of Judge Mishler compelling, especially in light of the judicial treatment of § 303 in the cases cited by him. Although the cases favoring the application of res judicata principles herein are well reasoned, they are distinguishable. As compelling as the reasons may be for the application of res judicata principles in administrative law generally, they are not to be applied in all § 303 actions after an N.L.R.B. determination, especially, where as here, the defendant D.C.9 was the only named party before the N.L.R.B. and the litigation now before the court names twenty-six defendants, including D.C.9. Many issues arise between the many parties in the case at bar that were not issues in the proceeding before the N.L.R.B. and certainly were not in the injunction proceeding before this Court in 1968 which involved the same plaintiffs but not the same defendants. Only D.C.9 was a defendant in that proceeding.

Additionally, the defenses interposed by the defendants in their answers are issues of fact that must be determined separately from the issues of fact before both the N.L.R.B. and this Court in the 1968 proceedings. This Court cannot say that the answers of the defendants in this case must be stricken on the ground that they are clearly insufficient as a matter of law. The contrary appears to be so.

The plaintiffs' motion for summary judgment must be denied.

II

■ The six so-called autonomous locals affiliated with D.C.9 have made cross motions for summary judgment dismissing the complaint against them. The autonomous locals contend that there exists no genuine issue as to the fact that they did not engage in the actions on which the complaint is based and that

---

6. See also *Edgewood Contracting, supra; H. L. Robertson, supra,* and *Paramount Transport, supra.*

7. A person whose interest was represented in a judicial proceeding by one having authority to represent him might be bound by a judgment in a subsequent judicial proceeding, although he was not formally a party to the prior proceeding. Kersh Lake Drainage District v. Johnson, 309 U.S. 485, 60 S.Ct. 640, 84 L.Ed. 881 (1940). If it could be said as a matter of law that D.C.9 acted with authority to bind the affiliates, it might well be argued that the N.L.R.B. determination is binding on the affiliates. However, the plaintiffs have failed to prove as a matter of law that D.C.9 had authority to bind all of the affiliates and thus, summary judgment cannot be granted in their favor.

D.C.9 was *not* acting as their agent in those actions which gave rise to this action. Therefore, it is argued that the autonomous locals cannot be held liable for the acts of D.C.9 and summary judgment should be granted in their favor.

The defendants have filed a series of affidavits and exhibits, including the By-Laws of D.C.9, supporting their cross motions. The following pertinent facts can be elicited from said affidavits and documents:

(1) All of the defendants are associations and are constituent chartered bodies of the International Brotherhood of Painters, Decorators and Paperhangers of America, AFL–CIO. District Council No. 9 of the Brotherhood is composed of two distinct groups: twenty painter and paperhanger locals and six autonomous locals. The autonomous locals include locals 206 (glass handlers), 230 (signwriters), 806 (steel and bridge painters), 829 (scenic artists), 1087 (glaziers), and 1456 (maintenance employees). The autonomous locals are defined as those which have "autonomy in the conduct of their affairs, including organizing activities and negotiations, administration and enforcement of their collective bargaining agreements and engaging in economic activity to that end" (Brotherhood Constitution, Sec. 13).

(2) The territorial jurisdiction of D.C.9 is limited by its charter, issued by the Brotherhood, to New York City. It is required that "All local unions within the jurisdiction of the district council must be represented in and shall be governed by the rules of said council." (Brotherhood Constitution, Sec. 223(a)).

(3) Collective bargaining agreements for the painters and paperhangers are negotiated by a committee of the District Council composed of delegates from each of the painter and paperhanger locals; the collective bargaining agreements are enforced through the District Council; the cost of enforcing the agreements is financed by the dues of the painter and paperhanger locals which at the time of the matters complained of herein amounted to $5 per month per member; and job and shop strikes are called by the District Council after a vote of the council delegates from the locals covered by the trade agreement involved. (D.C.9 By-Laws, Articles II, III, and VI).

(4) In the case of the autonomous locals, several characteristics distinguish them from the painter and paperhanger locals. These characteristics include:

(a) The Brotherhood Constitution provides in Section 13 that the autonomous locals shall have complete autonomy in the conduct of their affairs.[8]

(b) Each of the autonomous locals negotiates its own collective bargaining agreement in its trade with employers; indeed, the D.C.9 By-Laws bar the autonomous locals from participation in trade agreements of the painting trade. Article II, Section 1 of the By-Laws states:

"Only those local unions which are affected by the trade agreement are to submit demands and have representatives elected or appointed to the agreement committee."

It further provides that the District Council Agreement Committee is to consist " * * * of one Council delegate from each local union affected by the trade agreement." The trade agreements negotiated by the Agreement Committee are to be subsequently ratified by the members of the locals affected. Thus, each autonomous local, having a separate trade, negotiates for itself the collective bargaining agreement in its trade with employers who are separate and distinct from employers in the housepainting trade.

(c) The cost of enforcement of the agreements is borne by the autonomous locals themselves, financed through dues payable to such local. The amount of dues payable by autonomous locals to the District Council is merely 10¢ per member per month.

3. *See* paragraph (1), supra, at p. 393.

(d) Each autonomous local has its own independent welfare and pension fund which is not connected with the Welfare and Pension Fund of the housepainters locals, and each autonomous local has its own independent by-laws, meetings and officers.

(e) The autonomous locals are excluded from the strike calling, strike participation, and strike settlement processes. Article VI, Section 3 of the D.C.9 By-Laws provides:

"Council delegates from the local unions covered by the trade agreement only shall vote to order job or shop strikes."

If a strike is called, picket line duty is an obligation only of those "members of affiliated local unions covered by the trade agreement." (Article VI, Section 7). General strikes are called by a majority vote of all members voting in local meetings on a resolution sent "to each affiliated local union covered by the trade agreement." (Article VI, Section 4). Finally, when there is a general strike, it is to be managed by a strike committee elected "by each local union affiliated with the Council and covered by the trade agreement." (Article VI, Section 5).

(5) All of the activities and acts of D.C.9 described in the complaint were those affecting the housepainting trade and had no connection with the autonomous locals. The various collective bargaining agreements of D.C.9 to which the plaintiffs were parties were collective bargaining agreements negotiated and enforced by D.C.9 for painters and paperhangers. An important element of the agreements is that they require the payment of certain pension, insurance, welfare, and annuity contributions as part of the wage package. The contributions are to funds for the benefit of painters and paperhangers, and the autonomous locals have no interest in those funds.

Therefore, the defendant autonomous locals contend that they were not in any way involved in the enforcement of the collective bargaining agreement with the plaintiffs; that D.C.9 could not be acting as their agent in the negotiation and enforcement of the collective bargaining agreement in question or in any other activities, which gave rise to this proceeding; that they have never ratified, adopted, or approved of any of the activities of D.C.9 complained of herein; and that D.C.9 was without authority to act on their behalf in the course of any of the activities complained of herein.

In opposition to the cross motions, the plaintiffs submitted, in addition to other papers, affidavits of one of their attorneys and of the General Manager of Delta.[9] The attorney's affidavit states that at no time did D.C.9 or any of the other defendants indicate to him that D.C.9 was not acting on behalf of every affiliated local; nor did any of the defendants so inform the B.O.E., the N.L.R.B., or anyone associated with either of the plaintiffs. The affidavit of the General Manager specifies that since 1964 he has entered into various collective bargaining agreements with D.C.9; that on various occasions during the period he inquired of D.C.9 as to the locals they represent and are affiliated with; that over the years, D.C.9 has represented that they are the bargaining agent for the affiliated unions as set forth on the inside back cover of the so-called "Trade Agreement" dated September 9, 1968 to July 31, 1971; and that all of the affiliated locals, now characterized in this case as "autonomous locals" were included on the aforementioned cover. The said affiant further avers that he and all others in the employ of the plaintiffs were without information that D.C.9 had limited authority to act on behalf of the so-called "autonomous locals."

Based on the facts related in their affidavits, the plaintiffs appear willing to concede that there did not exist a pure agency relationship between D.C.9 and

---

9. The plaintiffs have not contested the fact that the autonomous locals themselves did not engage in the actions in issue.

the autonomous locals with regard to the acts which gave rise to the complaint, but they maintain that since no notice of the limitations on the authority of D.C.9 to act for the autonomous locals was ever conveyed to the plaintiffs, there arose a relationship of *apparent authority* through which the autonomous locals could be bound by the acts of D.C.9. The plaintiffs' basic argument is that the failure of the autonomous locals to meet their obligation and to communicate to the plaintiffs the limitations on the authority of D.C.9 to represent them, especially in light of the use of their names on the back cover of the "Trade Agreement" furnished the plaintiffs, is fatal and such failure resulted in a situation where apparent authority existed and D.C.9 could bind the autonomous locals.

The plaintiffs raise several legal arguments to support their contention. They rely primarily on the New York Encyclopedia and cite only one case. They argue that it was necessary for the defendant autonomous locals to "bring home" to the plaintiffs the lack of authority in D.C.9:

> " '*Special* or secret instructions or *limitations* placed upon the authority of an agent whose powers would otherwise be coextensive with the business entrusted to him *must* be communicated to the party with whom he deals or the principal will be bound to the same extent as though they were not given.' (Emphasis supplied.) N. Y.Jur. Agency § 91.

> See Ruggles v. American Central Insurance Co. of St. Louis, 114 N.Y. 415, 21 N.E. 1000." (Plaintiffs' Reply Memorandum, p. 3).

It is contended that, under the circumstances in this case, the failure to communicate the limitations on authority is inconsistent with lack of authority; it is "indicative of an agency ratified" by the autonomous locals.[10]

The plaintiffs also maintain that the autonomous locals cannot "cloak themselves with immunity from suit due to their peculiar arrangements with their principal." Since the "world was not aware or informed of these matters [the limitations on authority]," the autonomous locals cannot escape liability:

> " 'Apparent authority is the result of consent manifested to a third party. The acquiescence of the principal to an extension of authority, beyond that actually conferred in the creation of the agency, to the transaction in question, may be sufficient to create the appearance of authority in the agent to do such act; the acquiescence in and consequent scope of such authority, is to be determined not only by what the principal actually does know of the acts of the agent within the employment, but also as to what he should, in the exercise of ordinary care and prudence know the agent is doing in the agency transaction.' (2 N.Y. Jr., Agency § 88)." (Plaintiffs' Reply Memorandum, p. 5).

The plaintiffs conclude their argument with a statement that it is incumbent on the defendant autonomous locals to prove the communication to the plaintiffs of the lack of authority and that, in the absence of such proof, the autonomous locals must be bound by the actions of D.C.9.

A more thorough examination of the principles of apparent authority indicates that the plaintiffs have not adequately treated with the concept.

 Apparent authority exists where a principal is bound to a third person by the act of his agent in excess or abuse of the latter's actual authority where the third person believes and has a right to believe that the agent was acting within and not exceeding his authority, and the third person would sustain loss if the act was not considered that of the principal.[11] Wen Kroy Real-

---

10. Plaintiffs appear to be confusing apparent authority and ratification of an agency relationship.

11. It would, perhaps, be initially important to note that it is unlikely that the plaintiffs will sustain loss if it is determined

ty Co. v. Public Nat'l Bank & Trust Co., 260 N.Y. 84, 91, 183 N.E. 73 (1932). While actual authority is the result of the principal's consent manifested to the agent, apparent authority is the result of consent manifested to the third party. (260 N.Y. at 91, 183 N.E. 73). The apparent authority for which a principal may be held liable must be traceable to him; it cannot be established by the unauthorized acts, representations, or conduct of the agent. 2 N.Y.Jur., Agency § 89 at p. 253.

■ The third party also has certain obligations. There can be no reliance on apparent authority unless the circumstances are such that the third party is entitled to rely thereon. Ernst Iron Works, Inc. v. Duralith Corp., 270 N.Y. 165, 170, 200 N.E. 683 (1936); Deyo v. Hudson, 225 N.Y. 602, 612–614, 122 N.E. 635 (1919). In Deyo it was held that a third party plaintiff asserting that the defendant was bound by apparent authority

"was bound to know the rule that requires one in dealing with an agent to ascertain the limits of his authority. * * * Defendant had no knowledge that such representations had been made. * * * Plaintiffs, having relied upon [the representations] without inquiry, may not transfer their loss to defendants without showing that defendants have assumed responsibility therefor." (225 N.Y. at 613–614, 122 N.E. at 639).

■■ Thus, one dealing with another known by him to be an agent is bound to inquire as to the extent of the latter's authority. See Sponge Rubber Products Co. v. Purofied Down Products Corp., 281 App.Div. 380, 119 N.Y.S.2d 783, 785 (1953). The duty of diligence in ascertaining whether an agent is exceeding his authority devolves on those who deal with him, not on his principal. Riley v. Larocque, 163 Misc. 423, 297

N.Y.S. 756 (1937); In Re Steinmetz' Estate, 1 N.Y.S.2d 601, 606 (Sur.Ct. 1938). Therefore, the principal will not be bound by the act of his agent in excess of his actual authority where the party doing business with the agent knows the extent of the latter's authority, or *where the facts and circumstances are such as to put him on inquiry as to the power and good faith of the agent.* Angerosa v. White Co., 248 App.Div. 425, 290 N.Y.S. 204, 214 (1936). (Emphasis added.) See also 2 N.Y.Jur., Agency § 77 at p. 244.

■ The plaintiffs also lay great stress on the fact that they could not have been bound by any special or secret limitations on D.C.9's authority. It is true that special or secret limitations upon the authority of an agent must be communicated to the party with whom he deals or the principal will be bound to the same extent as though they were not given. Bradford Co. v. Dunn, 250 N.Y. 461, 166 N.E. 167 (1929). However, as Local 230 indicates in its reply memorandum, the limitations on D.C.9's authority vis-a-vis the autonomous locals was not special or secret. The limitations are contained in the International Constitution and in the By-Laws of D.C.9 and were a matter of public record. Section 201(a)(1) of the Labor-Management and Reporting Act of 1949, 29 U.S.C. § 431(a) (1), requires that the Constitution of the International and the By-Laws of D.C.9 be filed with the Department of Labor; section 435 stipulates that these documents are of public character and are to be "[open to] inspection and examination, on the request of any person." Furthermore, pursuant to 29 C.F.R. § 70.1 et seq. (1970), the documents were at all times available at the Department of Labor's New York City office.

The circumstances in this case indicate that the plaintiffs should have had notice

that the autonomous locals were not bound by the acts of D.C.9. The defendants include D.C.9 and 26 local unions. If the plaintiffs are ultimately success-

ful, the absence of the six autonomous locals would probably not have an adverse effect on the chances of the plaintiffs for recovery.

of the possible absence of authority in D.C.9 to act for the autonomous locals in the negotiation and enforcement of the collective bargaining agreement with the plaintiffs and in the actions which gave rise to this proceeding. The autonomous locals were (and are) in no way involved in the housepainting trade, which is the only trade involved in the collective bargaining agreements and in the incidents subsequent to its finalization. If the plaintiffs were sufficiently diligent they would have been doubtful as to the power of D.C.9 to represent the autonomous locals in a situation involved only with the painting of a school. They should have made further inquiry into the relationship between the autonomous locals and D.C.9, and their alleged reliance on the "back cover" statement of a trade agreement alone is unreasonable.

The defendant autonomous locals raise a final argument in support of their cross motion. They maintain that the fact of affiliation between D.C.9 and the locals was not such that it would be reasonable for the plaintiffs to assume that D.C.9 was acting for the autonomous locals. ILA Local 418 (Continental Grain Co.), 155 NLRB 402 (1965), enforced on other grounds, Grain Elevator, Flour and Feed Mill Workers, etc. v. N. L. R. B., 126 U.S.App.D.C. 219, 376 F.2d 774 (1967), is cited as being directly on point. The case is not directly on point but is somewhat analogous to the instant case. In *Continental Grain,* the N.L.R.B. dismissed a complaint against an international (Seafarers International Union of North America—"SIU") which predicated wrongdoing on a theory that SIU's affiliated district on the Great Lakes was its agent. The executive vice president of the international, one Hal Banks, was at the same time the president of the district whose wrongdoing was being charged to the international by reason of the affiliation and Banks' position. In rejecting the argument of agency based on affiliation, the N.L.R.B. stated:

" * * * the mere fact that SIU, Canada, and SIUNA are affiliated is not itself sufficient to establish the responsibility of Respondent Seafarers' International for Banks' conduct. Accordingly, without reaching the question whether Banks' above speech constituted lawful primary strike action or an inducement to engage in unlawful secondary boycott activity, we find that the named Respondent, SIUNA, is not responsible for any of the acts in question alleged to have constituted unfair labor practices. We shall therefore dismiss the complaint with respect to SIUNA." (155 NLRB at 406).

In summary, the issue before this Court is whether in light of the foregoing facts and arguments of law, summary judgment should be granted dismissing the complaint against the "autonomous locals." Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, if it can be said that as a matter of law there is no genuine issue of material fact as to the facts that there was no agency relationship between D.C.9 and the autonomous locals and that D.C.9 was without authority to act for the autonomous locals, then summary judgment must be granted in favor of the autonomous locals dismissing the complaint against them. The plaintiffs maintain that (1) since neither D.C.9 nor any of the other defendants ever indicated to the plaintiffs, the B.O.E., the N.L.R.B., or anyone associated with the plaintiffs that D.C.9 was without authority to act for the autonomous locals, there existed apparent authority in D.C.9 to act for and bind the autonomous locals, and (2) since 1964, in the context of the negotiation and enforcement of various collective bargaining agreements, on various occasions D.C.9 has represented to John Durandes, the General Manager of Delta, that "they are the bargaining agent for affiliated unions as set forth on the inside back cover of the so-called 'Trade Agreement' dated September 9, 1968 to July 31, 1971."

The first point raised by the plaintiffs is legally deficient. Under the circumstances, the obligation was with the

plaintiffs to inquire as to the power and authority of D.C.9 vis-a-vis the locals, especially the autonomous locals. *See* discussion of apparent authority, supra, at pp. 28–33.

The second point is also inadequate to defeat the cross motion for summary judgment. Rule 56(e), Fed.R.Civ.P., provides that:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Rule 56 was amended in 1961 and the present wording in Rule 56(e) was designed to soften the strict policy against the granting of summary judgment in the Second and Third Circuits. *See* Waldron v. British Petroleum Co., 38 F.R.D. 170, 173 (S.D.N.Y.1965). An early construction of the new rule which has proved to have long standing precedent was rendered by the Second Circuit in Dressler v. MV Sandpiper, 331 F.2d 130 (1964).[12] The Court stated:

> "If the present case were to be decided under Civil Rule 56 as amended, it would then seem clear that respondent's vague and conclusory allegations * * * would not be sufficient to forestall the award of summary judgment. The highly general assertions of * * * [the] answer * * *, *buttressed by no specific facts or evidentiary data, are hardly the sort of concrete particulars which the amendments sought to require.* (331 F.2d at 133). (Emphasis added)`.

The plaintiffs have failed to respond with the "concrete particulars" required by Rule 56(e). While the rule requires a response with specific facts, the plain-

tiffs offer only general and unsupported statements. The plaintiffs fail to allege when or where the representations of agency were made; how many representations were made, and by whom representations were made. This Court can only conclude that the plaintiffs have failed to meet the requirements of Rule 56(e). Since summary judgment is otherwise appropriate, there being no other disputed issues of material fact with regard to the autonomous locals, the cross motion of the defendant autonomous locals should be granted and the complaint dismissed against them.

Accordingly, it is

Ordered that the motion of the plaintiffs to strike the answers of the defendants and for summary judgment on the issue of liability is denied, and it is further

Ordered that the motion of the defendants, Locals 206, 230, 806, 829, 1087 and 1456 "autonomous locals," for summary judgment dismissing the complaint against them is granted.

Submit orders in accordance with this decision with notice of settlement to opponents.

---

12. The case did in fact involve Admiralty Rule 58. The rule, however, is a carbon copy of Rule 56, Fed.R.Civ.P.