**WESTERN PUBLISHING COMPANY, INC., Plaintiff,**

v.

**FEDERATED GRAPHICS COMPANIES, INC. and Levenstein Gaines, Inc., Defendants.**

**No. 82 CIV. 4177 (JEL).**

United States District Court, S.D. New York.

April 19, 1985.

Fine Tofel Saxl Berelson & Barandes by Joel Reiss, Laura H. Rubin, New York City, for plaintiff.

M.S. & I.S. Isaacs by Michael Schlanger, New York City, for defendants.

LUMBARD, Circuit Judge: *

Western Publishing Company, Inc. sues Federated Graphics Companies, Inc. and Levenstein Gaines, Inc. for $73,444.12, plus interest—damages for the printing and production, pursuant to agreement, of approximately 780,000 catalogue covers that were subsequently rejected by Federated. Federated counterclaims for $8,515.93, plus interest—damages resulting from Western's failure to produce covers that "matched" a Cromalin (a color proof used in printing)

* Sitting by designation.

supplied by Federated. As Western is incorporated in Delaware, with its principal place of business in Racine, Wisconsin, and the defendants are residents of New York, jurisdiction is conferred by 28 U.S.C. § 1332 (1982).

The court finds that the "match" between the Federated-supplied Cromalin and the Western covers was well within the bounds of commercial acceptability and that the contract between the parties required nothing more. If a critical match between the Cromalin and the press proof was required, Federated Graphics was obligated either to have a representative present at the press run to approve the press sheets or otherwise to provide for press sheet approval prior to completion of the press run. Having failed to attend the production so that it could make its own subjective judgment as to the acceptability of a color match, Federated was in breach of contract when it rejected Western's commercially satisfactory product. The court directs that judgment be entered in favor of Western and against Federated Graphics and that Federated's counterclaim be dismissed.

Finding no basis upon which to hold Levenstein Gaines liable for Federated's breach of contract, Western's claim against defendant Levenstein Gaines is dismissed.

The court finds the following:

In June 1981, Meredith Burda Corporation requested Federated to arrange for the production of approximately 750,000 covers for the Pennsylvania House furniture catalogue.[1] Federated Graphics is a printing broker that arranges for the production of printed material for its clients by placing orders with outside companies and then supervising the overall production process. The Pennsylvania House covers

were needed for March 1982, in time for issuance of that year's catalogue.[2]

In late 1981, Richard Scharer, an officer, director, and shareholder of Federated, asked Eric Senkowsky, a salesperson for Western, to submit a proposal for the printing of the catalogue covers. Senkowsky had visited Federated's offices in New York in the fall of 1981 to solicit business, and had met with Herb Scharer, Richard Scharer's father and an employee of Federated. At the end of December, and after Richard Scharer's communication, Herb Scharer provided Senkowsky with specifications for the four-color printing job.

About January 8, 1982, Western submitted two proposals to Federated on the production and cost of the catalogue covers. The proposals were addressed to Richard Scharer, as Herb Scharer was vacationing in Africa. According to Senkowsky, he received a telephone call from Kenneth Lima, Herb Scharer's son-in-law, a few days later. Lima advised Senkowsky that Western had been selected to do the printing. On January 11, 1982, Senkowsky met with Lima, in the Federated offices, to discuss a reduction in the price of imprinting the names of individual stores on the back covers of the catalogues. In Senkowsky's presence, Lima signed one of the two proposals, after it was amended to reflect changes in the imprinting cost.

Senkowsky then passed the specifications along to Western's production plant in Poughkeepsie, New York. Between January 16, the date of Herb Scharer's return from Africa, and February 9, Senkowsky and Herb Scharer frequently communicated about the Pennsylvania House project. In a letter to Herb Scharer, dated January 20, 1982, Senkowsky confirmed specification and pricing changes:

---

1. In the contract between Western and Federated, four percent "overs," or additional copies, were added to this base figure.

2. The plaintiff alleges that Meredith Burda, in commissioning Federated, was acting on behalf of Levenstein Gaines, an advertising firm for Pennsylvania House, and that Federated agreed to broker the printing of the covers for Levenstein. Even assuming that Meredith was acting as an agent for Levenstein Gaines, however, plaintiffs have produced no evidence to show that Federated, too, entered into its contract with Western as an agent for Levenstein, and thus that Levenstein is liable under the contract as principal.

This is to confirm the final pricing on your Pennsylvania House cover job placed with Western Publishing's Poughkeepsie plant.

Relating to our January 8th contract: The base price will change to $60,083.00 and the press plates will cost $200.00 each for one color imprints on cover # 4. You will provide us the imprints to size on film. Western will run the four color on one press and run the one color imprints in a separate pass. All other specs remain the same. Final film requirements will be arranged between the plant and you or your staff.

Thanks again for the order.

Sometime between January 20 and February 9, Herb Scharer advised Senkowsky that the color film and Cromalin that Western was to use in its printing would be supplied by Spectragraphics, Inc., and delivered to the Poughkeepsie plant around February 12. Scharer also indicated that 4,950 covers would be needed on March 4, 1982, with the balance due on March 12. In a letter dated February 9, Herb Scharer provided Senkowsky with a purchase order that recapitulated the terms of the agreement between Western and Federated, with minor revisions. In the final paragraph of this letter, Scharer stated:

If possible, we will arrange for one of our people to be available for a press OK, otherwise you are to match the cromalins except that the blue used on the cromalins is not PMS 540.

The press date for the Pennsylvania House job was originally February 17, 1982. Western later changed this date to February 18, and then February 19, due to minor delays. When Senkowsky informed Scharer that the final press date had been set for February 19, a Friday, Scharer told Senkowsky that he could not be present on that date, but that Senkowsky could "okay" the press sheets for him.

On February 19, Western began its presswork on the Pennsylvania House covers. At around 3:00 that afternoon, when Senkowsky examined the first sheets off the press, he was dissatisfied with the color match of the inside front cover, particularly with the red of a chair on the press sheet, which was less brilliant than the red in the Cromalin. After conferring with production personnel, Senkowsky telephoned Herb Scharer, then in New York, at about 5:00 p.m. He told Scharer that Western was having difficulty matching the color in the red chair. Scharer told him simply to match the Cromalin and Senkowsky promised that Western would do the best that it could.[3] Later, about 8:00 p.m., Senkowsky signed a press okay authorizing the press run on the inside front cover. By his own testimony:

About eight o'clock that night [the press foreman] came up with a match which I felt was a commercially acceptable match to the Cromalin ...

I signed a press sheet, which was my approval for the job.

On February 20, Senkowsky, back in New York, mailed samples of the inside front cover, by priority mail, to Lynchburg, Virginia, where Herb Scharer was scheduled to arrive on February 22, the following Monday, to work on the inside of the catalogue. On February 22, Senkowsky sent proofs from Western's New York office, via a messenger service, to Federated's offices in New York. According to Senkowsky, he received a telephone call from Ken Lima on February 22 or 23. Confirming receipt of the samples, Lima spoke with Senkowsky concerning the copy on the inside cover. Senkowsky then returned to the Poughkeepsie plant, where he approved a press sheet for the front cover.

While in Poughkeepsie, Senkowsky received a telephone call from Herb Scharer, in Lynchburg. Scharer told Senkowsky that Federated's client would need 10,000

---

**3.** Scharer and Senkowsky disagreed on the substance of this conversation. Senkowsky testified that Scharer "agreed" to Senkowsky's assurance that Western would do the best that it could in matching the Cromalin. Scharer, on the other hand, insisted that he told Senkowsky that *all* of the colors had to match those in the Cromalin and that Senkowsky never stated that Western would simply do its best. The court credits Senkowsky's account.

advance covers, rather than the 4,950 originally agreed upon. Senkowsky agreed to send more copies, but asked for an extension beyond the initial due date of March 4. Nothing was said about the previously forwarded samples. On February 23, Senkowsky sent yet another set of samples, this time of the front and inside front covers, to Lynchburg. These press sheets were followed by a final set of proofs, sent by Senkowsky on or about February 25 via an overnight pouch service from New York. The samples were sent to Lynchburg, for Herb Scharer's attention. Airplane tickets showed that Scharer was in Lynchburg from February 22 through February 26, in New York from February 26 to March 2, and then back in Lynchburg until March 5. Samples were thus available for his examination for essentially the entire period from February 22 until March 5.

On March 5, two weeks after Senkowsky's okay of the first press run, Scharer telephoned Senkowsky and told him that the catalogue covers were unacceptable. By this time, Western had essentially completed the printing and imprinting of 780,000 covers. Scharer agreed to accept the 10,000 advance copies for his client's immediate use and then to meet at the Poughkeepsie plant to discuss the printing.

On March 8, Scharer and Senkowsky drove from New York to Poughkeepsie, where they met with Douglas Gould, Western's regional sales manager, John Stewart, manager of the Poughkeepsie plant, John Klumb, superintendent of the lithograph department, and other Western employees. Scharer examined a representative sampling of the production run in a light room. He complained about the red in a cherry desk on the front cover and asserted that the inside front cover was muddied. Western offered to reprint some of the covers.[4] Scharer, however, asserted that the entire job was unacceptable and asked Western to redo the run, at Western's expense, less the cost of any increase in the price of the paper. Gould told Scharer that Gould would have to consult with Western's management and the meeting adjourned.

By letter dated March 9, Gould informed Scharer that Western would not reprint the entire job. The 10,000 advance copies had already been shipped to Lynchburg and accepted by Federated. In fact, some of the covers were used by the customer. Federated, however, refused to accept delivery of the remaining 770,000, though it conceded that it was liable for the 10,000 copies that had been shipped in advance. On March 10, Federated contracted with R.R. Donnelly & Sons Company, Inc. to print the covers.

According to Federated, it was not obligated to accept any of the catalogue covers produced by Western, because the covers did not "match" Spectragraphic's Cromalin. The defendant relies on the language in its purchase order of February 2, 1982:

> If possible, we will arrange for one our people to be available for a press OK, otherwise you are to match the cromalins
> . . . .

Federated contends that this provision, an amendment of the January 11 contract,[5]

---

4. According to Federated, Western's offer to cull out objectionable covers or to reprint some covers for Federated's customer was in bad faith—physically impossible, given the large number of covers that would have to be sorted through, and directed at the deception of Federated's customer through the selection of a small number of acceptable covers for the customer's examination. The court, however, credits the testimony of Douglas Gould, regional sales manager at Western, who stated that when the offer was made, Western anticipated that only 10 to 15 percent of the covers would be found unacceptable. Gould also stated that Western's quality control department can scan large amounts of printed material to weed out the worst of a job. The court concludes that Western's offer was a good faith attempt to resolve the contract dispute.

5. At trial, Federated attempted to argue that Lima had no authority to contract on behalf of Federated Graphics and that, consequently, the proposal of January 8 did not constitute a contract between Federated and Western, when signed by Herb Scharer's son-in-law. The defendant thus contends that the contract between

superseded the disclaimer in the Western proposal signed by Lima:

> Color Proofing: Because of the difference in equipment and conditions between the color proofing and the press room operations, a reasonable variation in color between color proofs and completed job shall constitute an acceptable delivery.

For the reasons stated below, however, the court finds that the provision in Federated's purchase order, even if construed as an additional term to the original agreement, did not modify the contract so as to make Federated's payment conditional upon anything other than a commercially acceptable match between the colors in the Cromalin and the colors in the completed covers.

In the "Cromalin Communicator," a trade publication, Dupont, the manufacturer of Cromalins, has stated that a printer will rarely achieve an exact match between a Cromalin and the standard press sheet in all colors and tone values.[6] In part, this is because of differences in the ink absorbency of papers used in the production process, the expense of stopping and starting presses to vary inks in order to brighten or darken particular tones, and even the amount of moisture in the air on the day of printing. More basically, the "art" of matching color—and particularly the matching of a film proof to a press sheet—is inexact. Within the bounds of commercial acceptability, the "match" of a Cromalin to a press sheet lies in the eyes of the beholder.

According to Dr. Albert Materazzi, plaintiff's expert, the instruction to match the Cromalin thus does not usually require an eye perfect—and often unattainable—match, but demands, instead, that a printer match colors within the constraints of time, money, and materials. A commercially acceptable match is not exact; it is simply a reasonable variation from a color proof.

Dr. Materazzi testified that when it is imperative that a match between a Cromalin and a completed product be as exact as possible, approval of the press sheet is generally given by the customer, though sometimes by a delegated surrogate, often the salesperson of the printing company. A critical color match also requires greater attention than is usual to the materials used in the production process.

Federated did not arrange for a representative to be present at the press okay. Far from alerting Senkowsky that a critical match was imperative, Scharer, in their February 19 conversation, agreed that Senkowsky should do the best that he could in matching the color in the red chair.[7]

---

Western and Federated is actually reflected in Federated's purchase order of February 2.

Lima is not an employee of Federated Graphics, but is an officer, director, and shareholder of Transmarket Graphics, a company in the same business as Federated and located in the same offices, with a common reception area. Herb Scharer introduced Lima and Senkowsky during Senkowsky's first visit to Federated's offices, without advising him that Lima was not affiliated with Federated. Lima conferred with Senkowsky about the catalogue covers during the production process, and Scharer, upon his return from Africa, never objected to Senkowsky's January 20 letter, which referred to "our January 8th contract" and thanked Scharer for his order. Kenneth Lima was not called as a witness.

Though the court's decision does not turn on this finding, the evidence overwhelmingly supports the conclusion that Lima had both apparent and actual authority to act on behalf of Federated. Consequently, the proposal of January 8, when signed by Lima, constituted a contract between Federated and Western. *See Strip Clean Floor Refinishing v. New York District Council No. 9 Brotherhood of Printers,* 333 F.Supp. 385, 395–96 (E.D.N.Y.1971).

6. The "Cromalin Communicator" was identified and portions of it were read into evidence during the cross-examination of Nolan Meredith, Federated's expert.

7. Federated also argues that Senkowsky was not qualified to okay the press sheets and that it was relying on Western's color production personnel to achieve an acceptable match. As Dr. Materazzi testified, however, it is not unusual to designate a salesperson to okay a press sheet and, in this instance, Scharer expressly did so. Senkowsky was an experienced salesperson who had approved color on previous jobs. The court finds that he was competent to perform the press sheet okay, and, in any event, the court finds that the printing was commercially acceptable.

Scharer's failure to communicate with Western concerning the press proofs prior to March 5, despite the availability of proofs and Senkowsky's February 19 statement that Western was having some initial difficulty matching color, attests to the fact that Scharer was not concerned with achieving a critical match. Indeed, Dr. Materazzi testified that Federated's supervision of the Western job could not have been directed at producing such a match. An exact match was impossible, according to Materazzi, because of the very film and paper provided or specified for use by Federated.

■ Crediting Dr. Materazzi's testimony, and that of Eric Senkowsky, the court concludes that Federated's February 2 instruction to "match the cromalins" required only that Western provide a commercially acceptable product, and not an exact or eye perfect match with Spectragraphics's proof. Further, if Federated had wanted a more exact match—with the subjective judgment that such a match requires—a Federated representative should have been present at the press okay, as Richard Scharer was later, during production of the Donnelley covers. Alternatively, Federated should have clearly conditioned its contractual obligations upon press sheet approval, and arranged for such approval to be given. *Cf. Wagner v. Derecktor*, 306 N.Y. 386, 391, 118 N.E.2d 570, 572 (1954) (asserting "well-settled rule" that a party cannot insist on a condition when that party has caused its nonperformance). Instead, it disregarded the numerous proof sheets sent by Western while the presses were running. *Cf. Columbia Broadcasting System, Inc. v. Stokley-Van Camp, Inc.*, 522 F.2d 369, 378 (2d Cir.1975) (discussing equitable duty to speak).

■ The court also finds that the product supplied by Western was commercially acceptable. Dr. Materazzi stated that, of four sample Western covers that he examined on June 14, 1983, one of the covers was a closer match to the Cromalin than that of a Donnelley cover commissioned after the Western presswork and accepted by Federated. The three others, in his opinion, were as good as the Donnelley product. Materazzi contended that, though the Western covers that he examined were not perfect matches to the Cromalin, the match achieved was reasonable by industry standards.[8]

The court has examined the Cromalin for the inside cover and compared it with the press sheet which Federated had printed after the dispute and with three samples produced by Western. Based on this inspection of the exhibits, and crediting the testimony of Dr. Materazzi, the court finds that the match between the Western samples and Spectragraphics's Cromalin, while not perfect, is well within the bounds of a reasonable variation.

The court notes that Federated relies heavily on a Western interoffice communication dated March 12, 1982, a few days after the meeting between Scharer and Western personnel at Poughkeepsie, in arguing that the Western covers were not acceptable. In this memorandum, John Klumb, superintendent of the lithograph department and present at the February 19

---

8. Materazzi's testimony conflicted with that of Nolan Meredith, Federated's expert and president of Spectragraphics. The court, however, credits Materrazi's conclusions as to the quality of the Western product. Materazzi examined 32 covers randomly drawn from 200 covers that were selected by Federated, pursuant to a discovery request. Of these, Materazzi found 29 to be acceptable matches to a Cromalin made from the negatives furnished by Federated. Materazzi later examined a Cromalin proof for the inside cover, the negatives from which the proof was made, three randomly selected Western covers, the okay press proof and the printed cover catalogue before reaching his conclusion that the covers produced by Western were an acceptable match to Federated's Cromalin. Materazzi is presently Scientific and Technical Consultant for the National Association of Printers and Lithographers and was formerly manager of the Quality Control and Technical Department of the United States Government Printing Office.

and 22 press runs, advised John Ives, Western's quality control manager, about events leading up to the press okays:[9]

> I ... check[ed] back with Eric [Senkowsky] numerous times during the okays offering advice and any help he needed. During the first okay, cover 2, we changed ink rotation to help add brightness to the red chair. We also found during that same side that we would not "match" the cromalin. At that time I had Eric notify customer and informed him (Eric) that this was as close as we were going to get without pulling the job and altering the film. Eric was also instructed only to okay the sheet if he felt he could sell it.

> We stayed with the same ink rotation on the second side and Eric's comments during the okay were that he felt the front cover was coming along better than cover two and looked good. We discussed the importance of matching the desk top to the cromalin with the pressmen for the run.

The court finds, however, that this memorandum is not inconsistent with the conclusion that Senkowsky exercised reasonable judgment in authorizing the press runs. Because exact matches are very difficult to achieve, even when great care has been taken to produce a critical match, the customer or, if so delegated, the printer must inevitably make a subjective judgment about the acceptability of a given variation. Klumb's advice that Senkowsky should okay the sheet only if he felt he could sell it simply alerted the salesman to the fact that an eye perfect match had not been achieved, and that Senkowsky should not authorize a press run if such a match were, indeed, required. Senkowsky, however, had not been instructed that a critical match was imperative and thus had no reason to believe that a commercially acceptable variation would be unsatisfactory. In any event, Klumb was not present when Senkowsky later okayed the first press sheet, three hours of additional work after the 5:00 p.m. conversation in which Senkowsky advised Scharer that he was having some difficulty matching the red chair.

Having delegated the responsibility for making the decision as to what constituted an acceptable match to Senkowsky, Federated is bound by his judgment, provided it was exercised in a reasonable, commercially acceptable manner. *Cf.* U.C.C. § 2–210(1) (1977). The court concludes that Senkowsky's judgment was so exercised.

Because Federated was in breach of contract when it rejected Western's commercially acceptable product, it is liable to Western for $73,444.12, the agreed value of the catalogue covers plus freight charges incurred, and for interest from March 15, 1982. Western is not liable to Federated on its counterclaim for any difference in value between the Western covers and the Donnelley covers which Federated commissioned subsequent to its breach.

The court directs that judgment be entered for plaintiff Western Publishing Company, Inc. against defendant Federated Graphics Companies, Inc. for $73,444.12, with interest from March 15, 1982. The complaint against defendant Levenstein Gaines, Inc. and the counterclaim against plaintiff Western Publishing are dismissed.

This opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.Proc. 52.

SO ORDERED.

---

**9.** Klumb was not called as a witness.