GRAIN ELEVATOR, FLOUR AND FEED MILL WORKERS, INTERNATIONAL LONGSHOREMEN ASSOCIATION, LOCAL 418, AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 19754.

United States Court of Appeals District of Columbia Circuit.

Argued June 15, 1966.

Decided March 31, 1967.

Mr. Irving M. Friedman, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Messrs. George Kaufmann and Ronald Rosenberg, Washington, D. C., were on the brief, for petitioner.

Mr. George H. Cohen, Atty., N. L. R. B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N. L. R. B., were on the brief, for respondent.

Mr. Ronald Goldfarb, Washington, D. C., filed a brief on behalf of Maritime Trades Department, AFL–CIO, as amicus curiae.

Before DANAHER, BURGER and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case involves the secondary boycott provisions of section 8 of the National Labor Relations Act and whether certain conduct by the petitioning union was unlawful secondary activity or a protected incident of a primary strike.[1]

The primary labor dispute concerns an employer, Upper Lakes Shipping, Ltd. (Upper Lakes), and union, Seafarers' International Union of Canada (SIU), that are Canadian entities. The secondary employer, Continental Grain Company (Continental), is a grain shipper using Upper Lakes ships. Continental is based in the United States, as is the secondary union representing some of Continental's employees, Grain Elevator, Flour and Feed Mill Workers, International Longshoremen Association, Local 418, AFL–CIO (Local 418). Local 418, the petitioner, seeks review of the Board's order holding its conduct an unfair labor practice, and the Board has cross petitioned for enforcement of its order.

SIU, seeking support in its labor dispute with Upper Lakes, endeavored to stop the loading of Continental's grain on Upper Lakes' ships. When the ships arrived for loading alongside Continental's grain elevators at Calumet Harbor in Chicago, SIU picketed and the members of Local 418 refused to load. Continental obtained a state court order enjoining the picketing. Subsequent Upper Lakes ships arrived, but Local 418 members continued to refuse to load despite the absence of picketing. Continental filed an unfair labor practice charge with the National Labor Relations Board alleging that Local 418 had induced its members not to load the Upper Lakes ships with an object of forcing Continental to cease dealing with Upper Lakes. The Board obtained a temporary restraining order pursuant to Section 10(l) of the Act, barring Local 418 from inducing its members not to load the Upper Lakes ships. Subsequent ships arrived but Local 418 members still refused to load. On the Board's civil contempt petition, Local 418 was found in contempt of the injunction,

---

1. The secondary boycott provisions, 29 U. S.C. § 158(b) (4) (1964), state in pertinent part:

    (b) It shall be an unfair labor practice for a labor organization or its agents—

        *      *      *      *      *

    (4) (i) * * * to induce or encourage any individual employed by any person engaged in commerce * * * to engage in, a strike or a refusal in the course of his employment * * * to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce * * *, where in either case an object thereof is—

    *      *      *      *      *

    (B) forcing or requiring any person to cease * * * doing business with any other person * * *: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

and the Seventh Circuit affirmed.[2] When the unfair labor practice case came before the Board on the merits, it found that Local 418 not only had induced its members not to load the Upper Lakes ships but also had threatened Continental with wider work stoppages, and that these activities had been done with the object of forcing Continental to cease dealing with Upper Lakes.[3] Two members dissented.

■ Petitioner contends that the Board lacked jurisdiction because the subject matter of the primary dispute involves the internal affairs of parties based in Canada. The short answer is that the Board is not here exercising jurisdiction over the Canadian primary dispute, but over secondary activity in this country, "directed against an American employer by an American labor organization and involving employees working in a domestic plant of the American employer." [4]

■ The Board's findings cannot be successfully undermined on the ground that the secondary employees had acted individually in deciding to avoid the struck ship. The substantial evidence of record supporting the Board's findings includes the following: High officials of the International Longshoremen Association frequently declared it to be ILA policy to support SIU in its dispute with Upper Lakes. The president of Local 418 repeatedly told Continental that the Local was committed to assist SIU, that it con-

sidered there to be an "invisible picket line" around the Upper Lakes ships, and that grain would not be loaded onto those ships. The same Local officials who had participated in the formulation of the ILA policy not to load Upper Lakes ships were present at Continental's docks at the time the Local members refused to load, and the officials conducted closed door meetings with the members just prior to their refusals. One Local member when ordered by Continental to load stated that he was sorry but he was afraid to load. The Local president told Continental's vice president that if Continental persisted in its attempt to load Upper Lakes ships, it would have trouble at its Texas elevators.

The Board's findings place petitioner's conduct squarely within the prohibitory language of the Act's secondary boycott ban. The question becomes whether this conduct is taken out of the ban by the reach of the Act's expressed exception for primary strikes or primary picketing.[5] The Board resolved this question by formulating and applying a rule that may fairly be restated as follows: In the situation where the situs of the primary dispute is movable and is located temporarily at the premises of a secondary employer, there must be lawful on the scene picketing by the primary union in order for the exception to be applicable to justify non-picketing appeals by the secondary union to its members for a work stoppage in support of the primary union.[6] Since the present case involves

---

2. Madden v. Grain Elevator, etc., Local 418, 334 F.2d 1014 (7th Cir. 1964), cert. denied, 379 U.S. 967, 85 S.Ct. 661, 13 L. Ed.2d 560 (1965).

3. Grain Elevator Workers Local 418 and Continental Grain Co., 155 N.L.R.B. 402 (1965). At the time of filing its charge with the Board against Local 418, Continental made the same charge against Seafarers' International Union of North America (SIUNA), the United States based parent organization of SIU. As with Local 418 the charge resulted in an unfair labor practice complaint, but the Board later dismissed the SIUNA complaint, concluding that regardless of whether SIU had acted lawfully in seek-

ing the support of Local 418, SIUNA could not be held responsible for the acts of its autonomous affiliate.

4. Madden v. Grain Elevator, etc., Local 418, supra note 2 at 1019. That opinion sufficiently demonstrates the inapplicability to the controversy before the Board of the Supreme Court's decision in Incres S.S. Co. v. International Maritime Workers, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963), upon which petitioner relies.

5. See note 1, supra.

6. Pertinent portions of the Board's opinion, Grain Elevator Workers Local 418 and Continental Grain Co., supra note 3,

a movable primary situs that had moved next to the premises of a neutral employer and since there was no lawful on the scene picketing by SIU at the time Local 418 was found to have been making appeals to its members not to load Upper Lakes ships, application of the Board's rule rendered unlawful such appeals by Local 418.[7]

Petitioner contends that its conduct is within the "primary activity" exception to the prohibition because it resulted in no more than has already been held permissible under the exception under

155 N.L.R.B. at 411–13, are set out below:

[A]t least in a case such as this one, where the labor dispute is between a primary employer with an ambulatory situs and a union other than the one which seeks to induce secondary employees to take action because of that dispute, there must be some clear and contemporaneous notice given by the primary union to the employees appealed to, and to the neutral employer at whose premises the dispute becomes active, that the labor dispute involved is between it and the primary employer. Unless such notice is given, the dispute takes on the appearance and character of a dispute between the "inducing" union and the neutral employer over the latter's dealings with the primary employer rather than of a dispute between the primary union and the primary employer.

In cases involving picketing of an ambulatory situs temporarily located at a neutral employer's premises, the Board, in recognition of the fact that

* * * picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their own employer in order to force him to refuse to deal with the struck employer * * *

applies the *Moore Dry Dock* tests, to determine whether the picketing has one or the other of these objects. These tests require, in effect, that the picketing union give notice to the neutral employer's employees, as well as to all other employees who have business with the neutral employer, that its dispute is with the primary, not the neutral employer. Though these tests impose some limitation on the union's freedom to picket the primary employer, they nevertheless do protect its right, and the right of other unions who would aid its cause, to appeal to all employees approaching the picket line to extend the union member's traditional gesture of support to the primary union, namely a refusal to cross its lawful picket line in order not to contribute to the operations the picket line is endeavoring to halt, while at the same time they protect the neutral employer, at whose premises the dispute is located, from becoming an object of secondary pressure.

The underlying considerations that lead the Board in ambulatory situs situations to infer an unlawful objective when picketing deviates from *Moore Dry Dock* standards also dictate a like inference where pressures are exerted against the neutral employees by a secondary union in the absence of a picket line directed at the primary employer while the situs of the dispute is lodged at the neutral premises. A failure to draw an inference of illegality in such circumstances would give, it seems to us, greater freedom to secondary unions to disrupt the business of the neutral employer whose premises temporarily house the primary ambulatory situs, than is given under our *Moore Dry Dock* tests to the primary union directly involved. Moreover, to permit such conduct on the theory that a "phantom" or "invisible" picket line is to be presumed even though there is no picket line in fact, would provide a ready device for evading the effects of an injunction prohibiting picketing that might be obtained against the primary union. It would also destroy the careful balance now existing between the right of the primary union, and those unions who would take up its cause, to appeal to employees approaching struck "ambulatory" premises to refrain from entering those premises, and the right of neutral employers to remain free from pressures directed toward forcing them to cease dealing with the primary employer. (Footnotes omitted.)

7. In affirming the rulings holding Local 418 in violation of the 10(*l*) injunction, the Seventh Circuit stated that the Local's conduct was also in violation of the Act's secondary boycott provisions, on the ground that the work stoppages induced occurred at the premises of the secondary employer. Madden v. Grain Elevator, etc., Local 418, *supra* note 2, 334 F.2d at 1020. This was not the basis of the Board's decision, and hence is not before us.

decisions of the Supreme Court—namely an appeal by primary employees to secondary employees that does not contemplate complete cessation of the operations of the neutral employer but only cessation of those tasks of the neutral employees, such as deliveries to the primary employer, that aid the day-to-day operations of the primary employer. Local 761, IUE, etc. v. NLRB (General Electric), 366 U.S. 667, 680–681, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); United Steelworkers of America v. NLRB (Carrier Corp.), 376 U.S. 492, 498–499, 84 S.Ct. 899, 11 L. Ed.2d 863 (1964). These decisions do indeed countenance a direct appeal to secondary employees in the form of picketing conducted by primary employees, at least at a situs "proximate and related to the [primary] employer's day-to-day operations." *Carrier Corp., supra,* 376 U.S. at 500, 84 S.Ct. at 904. We may assume, at least for purposes of discussion, that the same test applies when picketing against a primary employer is conducted at the main premises of the neutral employer where that is as close as possible to the situs of the primary dispute, *e. g.,* where the primary employer's premises are ambulatory.[8] There is difficulty, however, in concluding that petitioner's activities are permissible merely because their impact in this case was no greater than what might have been attainable under the decisions as a consequence of picketing by primary employees.

There is a significant difference between the two issues, one whether picketing by primary employees is primary picketing, the other whether the secondary appeal is within the proviso in the absence of picketing by the primary employees. The Act by its specific terms excepts from the secondary boycott prohibitions only primary strikes and primary picketing. Petitioner in effect urges the Court to stretch the expressed terms of the proviso so as to exempt any secondary work stoppage appeal which is incident to a primary strike and is limited to the impact that would be permissible if a consequence of primary picketing. Our consideration of the development of the secondary boycott legislation, however, uncovers no basis for concluding that the primary proviso requires exemption from the general secondary boycott prohibition for any activities other than those specifically named in the exception.

The secondary boycott ban originated in 1947 as part of the Taft-Hartley amendments and was "to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests."[9] In interpreting the statute the courts worked

---

8. There is more difference in doctrine than in results between the Supreme Court's approach and this court's opinion in Seafarers International Union, etc. v. NLRB (Salt Dome Production Co.), 105 U.S. App.D.C. 211, 265 F.2d 585 (1959). This court reviewed a Board order enjoining picketing by primary employees (of Salt Dome) conducted at the premises of Todd Shipyards where Salt Dome's vessel was under repair. The case arose prior to the 1959 amendment. The court stated that the issue was whether the effect on Todd's workers was "an objective" or merely "an incident" of the actions of the primary employees; that the "hope" of the primary employees for support of Todd workers did not constitute that support "the objective of their actions." We need not consider whether these concepts

survive the Supreme Court decisions cited in the text. We call attention to factors, other than these concepts, which are emphasized in the opinion of Judge Prettyman—that the picketing "was as close as possible to the situs of the dispute," and that it in no way related to any of Todd's activities other than those of servicing the primary employer. "We do not view the acts of the Union as evidencing an objective to affect Todd any more than any picket line might affect a servicer or supplier of the picketed employer." These factors relied upon to underscore lack of impermissible "objective" are manifestly interrelated with the ingredients of the Supreme Court's decisions.

9. Local 1976, United Bhd. of Carpenters v. NLRB, 357 U.S. 93, 99–100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958).

out a way of saving primary picketing from the ban.[10] This result was approved by Congress when it made clear by express proviso that the rules establishing an exception for primary strikes and primary picketing were not being curtailed by the other 1959 amendments broadening the secondary boycott prohibition (in ways not here material) to its present form (see note 1).

The proviso reflects the concern of the legislators to preserve for unions the use of their historic weapons of primary strike and primary picketing, even though these realistically represent a form of inducement of secondary work stoppage when coupled with labor's tradition that secondary employees do not enter struck premises or cross picket lines. Congress' concern was not, however, to sanction a limited amount of impact no matter what the form of inducement. The analysis of the key legislators makes it clear that the Congressional focus was on the protection of labor's traditional means of conducting labor disputes, and was not an effort to insure that labor could have in all situations the same kind and extent of impact that it could obtain in some cases through those traditional means. The Congressional spokesmen considered an express proviso for primary activity to be necessary because if the 1959 House bill, which broadened the prohibitory language, were passed without this proviso—

* * * the pickets who appealed to a truckdriver not to enter the plant where men were striking for higher wages could be held guilty of an unfair labor practice.

Of course, if this is true of one picket line, it is true of every picket line, for picket line appeals to the employees of other employers not to enter the plant. The legality of every picket line would be cast in doubt.

It is not clear whether the House bill is intended to have this consequence. If that is the intent, there is a major difference between the House and Senate on which the Senate could not yield. If the consequence is unintended, this provision of the House bill must be redrafted.[11]

We conclude that the Board is not directed by the statute to permit non-picketing appeals merely because the resulting secondary impact may be no different from that which may ensue from permissible picketing appeals.[12] In short, Congressional approval of a union's use of a particular time-honored means, notwithstanding possibility of certain practical consequences, does not constitute a warrant to reach for the same or equiv-

10. NLRB v. International Rice Milling Co., 341 U.S. 665, 670–671, 71 S.Ct. 961, 95 L.Ed. 1284 (1951).

11. Kennedy-Thompson Analysis, 105 Cong. Rec. 16588, 16589, 2 NLRB Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 1706, 1707 (1959).

12. Similarly, we are not persuaded by petitioner's challenge to the Board's rule on the ground that it makes the availability of limited secondary pressure for implementing a primary strike depend on whether in a given fact situation picketing is permissible under state law, a matter which will vary from state to state. Such a result is unreasonable only if the 1959 intendment of Congress is divined to be the sanctioning of limited secondary pressure no matter what the form of inducement. As indicated above, we find no basis for such an inference in either the language or history of the 1959 legislation. When the secondary boycott prohibition was shaped so as to carve out the right of primary picketing, and the limited secondary pressure obtainable thereby, Congress was presumably aware of the elementary concept that the availability of this right would be subject to definition and controls under state law. Where primary picketing exists, the Federal exception is not rendered inapplicable merely because the picketing could have been subject to a decree of invalidity under state law. United Steelworkers of America v. NLRB (Carrier Corp.), supra 376 U.S. at 501–502, 84 S.Ct. 899. However, where there is no primary picketing—whether this is due to the inclination of the primary employees or the fetters placed on them by state law—the condition precedent to the Federal proviso is missing, and that exception cannot be invoked.

alent consequences regardless of means used.

We need not here consider whether the Act's secondary boycott provisions may be enforced so as to bar all secondary work stoppage appeals that are unaccompanied by primary picketing. The Board has not gone that far. It has said only that non-picketing appeals are unprotected in the situation where a movable primary situs has moved next to the premises of the secondary employer and the appeals are made by the secondary union in the absence of lawful on the scene picketing by the primary union.[13] Prohibiting such appeals by secondary unions is not only consistent with the expressed terms of the Act, it also seems to us highly reasonable in terms of protecting the neutral employer from potential disruption inherent in the situation. As the Board states in its opinion,[14] unless there is some clear and contemporaneous notice that it is the primary employer and not the neutral employer who is the cause of the work stoppages by the secondary employees, the work stoppages might lead outside parties having business with the neutral employer to think he is directly involved in the dispute and accordingly to cease dealing with him. By requiring that there be lawful on the scene picketing by the primary union as a precondition to the lawfulness of appeals by the secondary union, the Board has fashioned a rule generally calculated to insulate neutral employers from this broader type of secondary impact.[15]

Petitioner argues along the lines of the opinion of the dissenting members, that the Board's picketing requirement rule is unsound on the ground that the presence of picketing, rather than protecting the neutral employer, may turn out to heighten the disruption experienced by the neutral employer. Apparently the argument is that outside parties, who would not be deterred from dealing with the neutral by limited work stoppages of the neutral employees, would be deterred by picketing even though the picketing specified the primary employer as the target. It is at least doubtful whether the recent Supreme Court decisions would sustain picketing that resulted in a cessation of work for the neutral employer that was not related to the daily operations of the primary employer. In any event, it is a question of policy for Board resolution whether the neutral employer will be better protected by requiring picketing, with the concomitant notice that the neutral is not the pickets' foe, or by dispensing with a picketing requirement. We cannot say in the abstract that the Board's rule is so unreasonable as to constitute an abuse of permissible administrative latitude.

Petitioner moves on to argue that it was improper for the Board to apply its rule in this case because it does not satisfy the factual predicate or assumption that was the basis for the Board's rule. In this case, says petitioner, although there was no notice by virtue of picketing on the scene, there was notice in fact to all parties concerned that Upper Lakes and not Continental was the target of the work stoppages; and the work stoppage that actually resulted was confined to operations impinging on Upper Lakes. It is unfortunate that the Board's opinion does not expressly deal with petitioner's point. While an agency

13. Petitioner, like the dissenting members of the Board, rests its claim of right on the contention that it is a corollary of the asserted right of the primary union to make its nonpicketing appeal for support to the secondary employees and their union. The Board did not expressly decide whether the primary union has that right. We think the Board's latitude permitted reservation of that question while deciding that a picketing requirement governs resolution of the type of situation and interests involved in this case.

14. See note 6, *supra*.

15. For picketing to be lawful in a movable situs situation, the picketing must clearly indicate that the dispute is with the primary employer. Sailors' Union *and* Moore Dry Dock Co., 92 N.L.R.B. 547, 549 (1950).

is not required to dilate on every contention raised by the parties, the one involved here is of obvious importance and is urged to affect the soundness and substance of the doctrine fashioned by the Board. However, we think a fair reading of the opinion reveals that the Board evolved a general requirement in terms of likelihood of providing adequate notice, intending it to apply without regard to whether the particular case reflected actual notice provided in some other way. In insisting on strict adherence to its primary picketing conditions (the so-called Moore Dry Dock tests), the Board pointed out that these provide notice to the employees of the neutral employer "as well as to all other employees who have business with the neutral employer." The Board could properly adopt a rule that would assure general and adequate notice, and avoid a doctrine that would require it to determine in each case all the employees that might have occasion to visit the plant and whether they do or would have adequate notice of the labor situation. It seems to us permissible for an agency—like a legislature or court—to devise a rule setting forth certain conditions or requirements on the ground that these will be necessary in most instances to achieve a desired goal, without having to consider for every single situation whether they are necessary for that case.

█ We repeat that neither the Board nor this court is holding that primary picketing is a necessary condition in all cases. The statutory exception refers to "any primary strike or primary picketing." The underlying doctrine contemplates that the union engaged in a primary strike is "free to use persuasion, including picketing." [16] By implication there may be, in some cases at least, valid persuasion other than by picketing. The Supreme Court has made clear, however, that in applying the statute the Board may devise reasonable criteria in light of the means used by the union in promoting its case, and may shape and adjust these criteria in the light of its experience and understanding of the unfolding variant situations. The Board is aware of the need for a balance between on the one hand the union's right of primary activity, including the need for appeals to neutral employees whose tasks aid the everyday operations of the primary employer, and on the other hand the right of neutral employers to a limitation on the pressures thrust on them in labor controversies not their own. The courts of appeals do not have a primary responsibility but rather a limited review to ensure that the Board acts rationally, without violating ascertainable legislative intent, and upon the basis of substantial evidence. Local 761, IUE, etc. v. NLRB (General Electric), *supra*, 366 U.S. at 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 ff.; Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We have considered contentions raised with respect to the evidence [17] and

16. Local 761, IUE, etc. v. NLRB (General Electric), *supra*, 366 U.S. at 672, 81 S.Ct. 1289, quoting NLRB v. Local 294, 284 F.2d 887, 889 (2d Cir. 1960).

17. Petitioner at argument stressed the fact that full loading would have required at least one of the secondary employees to board the ship, but we have here more than a refusal to enter upon struck premises.

In this case the petitioner's activities also included threats of action elsewhere and also induced a stoppage of a range of activities at the plant of the neutral employer. The men did preliminary work, including placing the grain in the shipping bins, but refused to raise the shipping spouts, throw ropes on board the ship, and release grain through the spouts.

Petitioner does not argue that the case merely involves the proviso to section 8(b)(4) that provides that "nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer" whose employees are engaged in a strike approved by a union entitled to recognition by the employer under the Act. We need not consider whether or in what circumstances a secondary union has the right to appeal to its members to exercise the rights assured by this proviso. As already noted the employees refused to do certain work on Continental's premises. We also

objections to alleged departures from earlier Board precedents,[18] but are satisfied they do not warrant judicial interposition.[19]

Local 418's petition for review of the Board's order is denied. The Board's petition for enforcement of its order is granted.

So ordered.

need not consider whether this proviso is inherently unavailable where both primary union and primary employer are Canadian.

18. Petitioner invoked certain Board decisions prior to 1959 which allowed non-picketing appeals to secondary employees. Oil Workers Local 346 *and* Pure Oil Co., 84 N.L.R.B. 315, 319 (1949) ; Newspaper Deliverers' Union *and* Interborough News Co., 90 N.L.R.B. 2135, 2149–50 (1950) ; Sailors' Union *and* Moore Dry Dock Co., *supra* note 15, 92 N.L.R.B. at 551–52. The Board's decision discussed those precedents and distinguished them as not involving the combination of factors present in this case. *E. g.*, in *Interborough News*,

the Board allowed non-picketing appeals to secondary employees not to deliver newspapers to the struck primary employer who ran newspaper stands inside subway stations. The Board pointed out in the case now on review that the appeals approved in *Interborough News* were by a primary union, in implementation of its permissible picket line activity at fixed primary premises. The fact that the picketing took place at less than all of the subway station entrances does not undercut the Board's distinction.

19. See Newcastle Airport Comm'n v. CAB, 125 U.S.App.D.C. 268, 371 F.2d 733 (1966).