PLUMBERS AND STEAMFITTERS LOCAL 342, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 76–1968.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1977.

Decided Jan. 23, 1979.

John L. Anderson, San Francisco, Cal., with whom Peter D. Nussbaum, San Francisco, Cal., Patrick C. O'Donoghue, Washington, D. C., were on the brief, for appellants.

Alan Banov, Atty., N. L. R. B., John S. Irving, Gen. Counsel, John D. Burgoyne, Carl L. Taylor, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Coun-

sel, Washington, D. C., were on the brief, for respondent.

Before BAZELON, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion for the Court filed by BAZELON, Circuit Judge.

Dissenting opinion filed by LEVENTHAL, Circuit Judge.

BAZELON, Circuit Judge:

Petitioners, Steamfitters Local 342 (Steamfitters), challenge a decision by the NLRB, holding that Steamfitters' refusal to install a pipe system fabricated by a subcontractor violated § 8(b)(4)(B) and § 8(e) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4)(B) and 158(e) (1976). The Board has cross-petitioned for enforcement of its Order. Because we are unable to determine from the Board's decision precisely what work Steamfitters was claiming for its members, we cannot determine whether the refusal to handle was unlawful, and accordingly, we remand to the NLRB to clarify its decision.

I.

C. Overaa (Overaa) is a general contractor primarily engaged in building water and sewage facilities. Overaa is a signatory to a multi-employer collective bargaining agreement (the Agreement) with Steamfitters Local 342 which represents Overaa's plumbers and pipefitters.[1]

The Agreement contains several provisions which regulate the fabrication of pipe on projects covered by the Agreement.[2] The provisions are in essence "union stan-

1. Until about 1971, Overaa subcontracted all mechanical work involved in constructing water and sewage facilities. When Overaa began performing some mechanical work itself, the company signed an agreement with Steamfitters as representative of Overaa's plumbers and pipefitters. On June 30, 1974, the Master Agreement between Steamfitters and the multi-employer association expired, and on July 1, 1974, Overaa and Steamfitters entered into an interim agreement which continued in effect the terms and conditions of the Master Agreement. Until July 15, 1974, Plumbers Local 159 of the United Association of Plumbers and Pipefitters (U.A.) exercised jurisdiction over the work in question in this case, at which time Plumbers Local 159 ceded jurisdiction to Steamfitters, a sister Local affiliated with U.A. Overaa's employees who were subjected to the agreement (one a member of Steamfitters, the other two members of Plumbers Local 159) were unaffected by this change. J.A. 399.

2. The agreement provided in pertinent part:
   8. The terms and conditions of this Agreement insofar as they affect the Employer shall apply equally to any subcontractor under the control of, or working under contract with, such Employer on any work covered by this Agreement which is to be performed at the site of construction, alteration, building or repair of any building, or other work and said subcontractor with respect to such work shall be considered the same as the Employer covered hereby.
   * * * * * *
   13. [P]ipe formation 2 inches in diameter and under shall be fabricated and assembled on job site . . ..
   * * * * * *

15. Fabrication at Job Site or In Shop. To secure fabrication work for employees working under this Agreement in the principal work unit at the job site and in order to protect wages and working conditions of such employees in the principal work unit at the job site, the Employer may fabricate at job site or in a shop under the following terms and conditions:
   (1) Pipe formations over 2 inches in diameter, at the option of the Employer, may be fabricated on the job site or in a shop.
   (2) Piping formations requiring heat or other special treatment or the use of special tools and equipment may be fabricated on the job site or in the shop.
   (3) All pipe bends over 2 inches in diameter may be made up on the job site or in the shop.
   (4) All piping and assembling of panel boards shall be done on the job site or in the shop.
   16. When the word "shop" is used in this Section it shall be defined as a pipe fabricating shop where terms and conditions of employment for Journeymen Plumbers, Pipefitter-Steamfitters and their Apprentices performing such shop fabrication compare favorably with the terms and conditions of employment of the employees covered by this Agreement who would have performed the fabrication at job site if the Employer exercised his option to have it done at job site.
   J.A. 399-400.

dards" clauses, limiting the subcontracting of certain fabrication work to sub-contractors whose employees enjoy terms and conditions of employment that compare favorably with those guaranteed to workers covered by the Agreement.

In 1973, the East Bay Municipal Utilities District (East Bay MUD) chose Overaa as the general contractor for the Moraga pumping station. The specifications for the plant called for pipes ranging in diameter from 17″ to 72″, most to be cement lined and coated with lead paint. Overaa subcontracted the fabrication of the pipe to Conduit Fabricators, Inc. (Conduit), whose pipefitters were represented by Teamsters Local 490, and received wages below those received by members of Steamfitters under the Agreement. Conduit prepared plans and drawings that were approved by East Bay MUD, and work began. The process of fabricating the pipe to the required specifications comprised seven stages. Employees of Conduit performed some of this work; other specialized companies completed the remainder, both on and off Conduit's premises.[3]

■ By February 1974 Conduit had built and delivered the pipe for the Moraga plant. On June 4, 1974, while the pipe was awaiting installation, Dennis Gifford, a business agent for Steamfitters' predecessor, Plumbers Local 159,[4] informed Charles Burgin, Overaa's pipefitting foreman and a member of Steamfitters, not to handle the pipe fabricated under the subcontract to Conduit. At the same time, Gifford informed Overaa's job superintendent that the pipe was "unsuitable" for installation by Steamfitters.[5] For a period of time

---

**3.** The ALJ found that the process consisted of the following steps:

  a) Obtaining from a supplier millrun lengths of steel pipe of the requisite thicknesses and diameters, as well as assorted attachments—flanges, reducers, couplings, bolts, reinforcing pads, etc.—to be incorporated in the finished product by welding.

  b) Cutting the pipe to size and shape at Conduit's shop in Vallejo, California; then performing the various welding tasks involved in making joints and affixing attachments—that is, converting the raw components into a unified system.

  c) Hydrostatically testing for watertightness of welds.

  d) Stress relieving; i. e., placing the pipe in ovens to cure distortions of molecular alignment caused by uneven application of heat during welding. Conduit itself did not do this, instead having it done at a Kaiser facility 12 miles away.

  e) Upon return to the Conduit shop, sandblasting to remove oven scale.

  f) Lining the interior of the system with cement, followed by seven days of curing in a controlled environment. In the case of pump barrels, which were components in the system, the lining was vinyl rather than cement.

  g) Sandblasting the exterior of the pipe to remove rust created by curing, then applying an exterior coat of red lead paint.
J.A. 401.
Steamfitters maintain that their claim was limited to step "(b)" (the cutting and welding tasks) which the Board recognized members of Steamfitters "are capable of performing . with proper tools and equipment." 225 N.L. R.B. 1364, 1365 (1976).

**4.** Plumbers Local 159 ceded jurisdiction over this project to Steamfitters on July 15, 1974. *See* note 1 *supra*.

**5.** There is some suggestion in the record that the union's objection to the pipe fabricated by Conduit was the fact that Conduit's pipefitters were not represented by a United Association (U.A.) local. *E. g.,* J.A. 400. "Dennis Gifford, a business agent for UA Local 159, had told Foreman Burgin not to handle the pipe because it did not have a UA label." However, Williams, Steamfitters' business manager, informed Howard Verrinder, Overaa's job superintendent, that Steamfitters would refuse to handle the pipe because the pipe "was not in conformity to the contract" which he later testified as meaning that "those engaged in the fabrication of the pipe had not worked under wages, hours and working conditions customary to members of Respondent." J.A. 400.

If Steamfitters refused to handle the pipe because Conduit had no agreement with U.A., Steamfitters would clearly have violated the Act, by converting, in effect, its "union standards" clause into a prohibited "union signatory" clause. *See Local 644, United Brotherhood of Carpenters v. NLRB,* 175 U.S.App.D.C. 1, 11, 533 F.2d 1136, 1146 (1975); *Building and Construction Trades Council v. NLRB,* 117 U.S. App.D.C. 239, 328 F.2d 540 (1964). The Board, however, does not appear to place any significance on the statements of Steamfitters' representatives at the time of the dispute. Rather, the Board holds that the refusal to handle was secondary because the work was not fairly claimable by Steamfitters. 225 N.L.R.B. at 1367. But this interpretation of the Board's

after Steamfitters' initial refusal to install the pipe fabricated by Conduit, Overaa managed to work around the disputed pipe, but by July 15 no further work could go forward. On July 18, after negotiations between Overaa and the union, Steamfitters agreed to permit Overaa's pipefitters to install the pipe, while the union sought redress through the contract's grievance procedures. Work then resumed on the pumping station, and was completed early the following year.

On July 19 and 24, Conduit filed unfair labor practice charges against Steamfitters, based on the union's refusal to install the pipe. ·After a hearing, the Administrative Law Judge (ALJ) found that Steamfitters' refusal to handle the pipe fabricated by Conduit violated § 8(b)(4)(B) and § 8(e) of the National Labor Relations Act. The ALJ concluded that the refusal to install the pipe violated § 8(b)(4)(B) because Overaa had no "right of control" over the work subcontracted to Conduit. Therefore, in the ALJ's view, Steamfitters' action was not directed at Overaa, but rather was unlawful "secondary" pressure directed at Conduit. J.A. 403-04. The ALJ also held that the union's attempt to enforce the union standards clause in this case violated § 8(e) because the work in question was not "fairly claimable" by Steamfitters. J.A. 404.

The Board sustained the ALJ's conclusion that Steamfitters' action violated both § 8(b)(4)(B) and § 8(e). *Plumbers and Steamfitters Local 342*, 225 N.L.R.B. 1364

(1976). The. Board rejected the ALJ's "right to control" analysis of the § 8(b)(4)(B) violation, since under its contract with East Bay MUD, Overaa had full control in its choice of subcontractors. Instead, the Board found that because the work was not "fairly claimable" by Steamfitters the Union had violated both § 8(b)(4)(B) and § 8(e). The Board adopted as its own the recommended order proposed by the ALJ. Steamfitters petitions this court to review the Board's Order and the NLRB cross-petitions for enforcement.

## II.

In reviewing decisions of the NLRB, our function is to determine whether the decision of the Board is supported by substantial evidence on the record considered as a whole.[6] The problem posed by the Board's decision in this case is to determine just what, in fact, the Board has decided. The Supreme Court has made clear[7] and the Board acknowledges,[8] that not all so-called "work preservation" agreements such as the union standards clause in the Agreement violate the National Labor Relations Act. "The touchstone [in determining whether a refusal to handle violates the Act] is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." *National Woodwork Manufacturers' Ass'n v. NLRB*, 386 U.S. 612, 645, 87 S.Ct. 1250, 1269, 18 L.Ed.2d 357 (1967). Where the objective of a union standards clause is directed to the employer,

opinion is not free from doubt, and the Board's brief to this court adds to the confusion, asserting that Steamfitters action was prompted solely because Conduit's pipefitters were not represented by U.A.: "the Steamfitters and its sister local refused to install the piping system fabricated by Conduit, by their own assertions, because Conduit had no United Association contract and because Overaa had 'purchased fabrications to be installed by [Steamfitters] members without the union label.' " . NLRB Br. at 17. This is but one instance of the ambiguity in the Board's decision, and the further confusion engendered by Board counsel's "interpretation" of the Board decision which leads us to remand this case for clarification. *See* text at notes 11–15, *infra*.

6. National Labor Relations Act, § 10(f), 29 U.S.C. § 160(f) (1976); *see, e. g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 485–491 (1951); *Grain Elevator, Flour & Feed Mill Workers Local 418 v. NLRB*, 126 U.S.App.D.C. 219, 226, 376 F.2d 774, 781, *cert. denied*, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967).

7. *National Woodwork Manufacturer's Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *see also NLRB v. Enterprise Ass'n of Steam Pipefitters, Local 638*, 429 U.S. 507, 510-11, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

8. *E. g.*, 225 N.L.R.B. at 1365; NLRB Br. at 11–16.

it is primary activity, prohibited by neither § 8(b)(4) nor § 8(e).[9] As then Circuit Judge Wright observed in an opinion which foreshadowed the Supreme Court's decision in *National Woodwork:*

> Resolution of the difficult issue of primary *versus* secondary activity . . . involves consideration of two factors: (1) jobs fairly claimable by the bargaining unit, and (2) preservation of those jobs for the bargaining unit. If the jobs are fairly claimable by the unit, they may, without violating either § 8(e) or § 8(b)(4)(A) or (B), be protected by provision for, and implementation of, no-subcontracting or union standards clauses in the bargaining agreements.[10]

Thus, the liminal question in assessing the legality of the attempt to enforce a work preservation agreement is to determine what work the union in fact has claimed. On this critical question, however, the Board's decision is fatally ambiguous.

■ The Board adopted the recommended Order of the ALJ, who had directed Steamfitters to cease from "giving effect to the work preservation provisions of its agreement with C. Overaa & Co. in the manner herein found unlawful." J.A. 405. Neither the ALJ's opinion nor the Board's decision explicitly determines the precise scope of Steamfitters' claim, and therefore it is unclear what conduct the Board has proscribed.

■ The interpretation that flows most readily from the opinions of both the Board and ALJ is that Steamfitters conduct was prohibited because it had claimed the cutting and welding work on the lined and coated pipes, work that the ALJ viewed as an integral part of the larger process of cutting, welding, hydrostatically testing, stress relieving and lining the pipe.[11] However, counsel for the Board, in its brief to this court and in oral argument, suggested a different interpretation: that Steamfitters committed an unfair labor practice because it had claimed the "entire fabrication of an integrated unit of stress-relieved, lined, tested and coated pipe."[12] Counsel had recognized that had Steamfitters limited its claim to cutting and welding, such work might well be "fairly claimable" by Steamfitters.[13] At first blush, accepting counsel's interpretation seems attractive, especially since Steamfitters has intimated that it might not oppose the order so interpreted. Nevertheless, when we are called on to review the *Board's* decision, we cannot simply adopt counsel's suggested interpretation as an expedient to eliminate the ambiguity left unresolved by the Board. Whatever merit there may be in an inter-

---

9. *NLRB v. Enterprise Ass'n of Steam Pipefitters, supra,* 429 U.S. at 528 & n.16, 97 S.Ct. 891.

10. *Meat and Highway Drivers Local 710 v. NLRB,* 118 U.S.App.D.C. 287, 291, 335 F.2d 709, 713 (1964) (footnotes omitted); *accord, Sheet Metal Workers Local 223 v. NLRB,* 162 U.S.App.D.C. 145, 150·51, 498 F.2d 687, 692 93 (1974); *Orange Belt District Council of Painters, No. 48 v. NLRB,* 117 U.S.App.D.C. 233, 328 F.2d 534 (1964).

11. Thus, the Board observed:
   While the record does not indicate that the Steamfitters made a clear demand for the fabrication work, *the Administrative Law Judge found that at the time of the hearing it claimed the work of cutting and welding the pipe.*
   *       *       *       *       *       *
   Upon our review of the record on the whole, we conclude that the work claimed by the Steamfitters, *even assuming it made a narrow and specific claim to cutting and welding the pipe,* has not been traditionally or historically performed by the unit employees.
   ·225 N.L.R.B. at 1365, 1367 (emphasis supplied). Similarly, the ALJ noted:
   Respondent, although apparently never defining its concern to Overaa with such selectivity, took the position during the trial and in its brief that *it is interested only in those aspects of the fabrication process embodied in Item b), above, namely, cutting and welding.*
   J.A. 402 (emphasis supplied).

12. NLRB Br. at 18. According to counsel for NLRB, Steamfitters narrowed their claim only after the Board decision and that prior to that time, Steamfitters refused to handle the pipe solely because Conduit lacked a U.A. contract. NLRB Br. at 17. *See* n.5 *supra.*

13. NLRB Br. at 18: "cutting and welding . . are unquestionably 'fairly claimable' tasks . . . ."

pretation offered by counsel, "[t]he integrity of the administrative process demands no less than that the Board, not its legal representative" perform the functions entrusted to the Board. *NLRB v. Food Store Employees*, 417 U.S. 1, 9, 94 S.Ct. 2074, 2079, 40 L.Ed.2d 612 (1974).

> For reviewing courts to substitute counsel's rationale or their discretion for that of the Board is incompatible with the orderly function of the process of judicial review. Such action would not vindicate, but would deprecate the administrative process for it would "propel the court into the domain which Congress has set aside exclusively for the administrative agency." *Securities & Exchange Commission v. Chenery Corp.* [332 U.S. 194, 196, 67 S.Ct. 1575, 1760, 91 L.Ed. 7995 (1947)].

*NLRB v. Metropolitan Ins. Co.*, 380 U.S. 438, 444, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965). What is true for post hoc rationalization is *a fortiori* true for counsel's suggested determination of the substance of an administrative decision, particularly where the uncertainty turns on the resolution of questions of fact, a task entrusted by the Act to the ALJ in the first instance, and ultimately to the Board, subject to our limited review. To resolve the ambiguity in the Board's decision would be to intrude into the function which Congress has reserved to the Board—to decide initially

what acts constitute unfair labor practices.[14]

Our decision to remand this case to the Board for clarification comports with the fundamental relation between the administrative process and reviewing courts. "The administrative process will best be vindicated by clarity in its exercise." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 853, 85 L.Ed. 1271 (1941). As the Supreme Court observed in *SEC v. Chenery Corp. (Chenery II )*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 995 (1947):

> It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M., St. P. & P. R. Co.*, 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023 [1935].

A remand in this case is appropriate not only to foster orderly administrative process, but also to avoid an unnecessary decision on novel and difficult questions of law under the Act. While the Supreme Court has noted that work preservation agreements with primary objectives are not prohibited by either § 8(b)(4) or § 8(e), the precise contours of permissible agreements have yet to be defined.[15] We think it incon-

---

14. "For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). *See also Carpet, Linoleum, Soft Tile Layers Local 419 v. NLRB*, 151 U.S.App.D.C. 338, 347·50, 467 F.2d 392, 401–02 (1972); *Grain Elevator, Flour & Feed Mill Workers Local 418 v. NLRB, supra*, 126 U.S.App.D.C. at 226, 376 F.2d at 781.

15. The Board attempts to distinguish this case from *National Woodwork*:

> Thus, the situation presented here is quite different from the one in *National Woodwork, supra*, where the union's sole objective was the protection of traditional unit work. Here, even if it be assumed that the contractual provisions relied on by the Respondent had a work-preservation purpose and that

the unit employees were fully capable of performing the work in issue, the fact remains that this work has traditionally been performed by employees outside the unit and not by the unit employees themselves.

225 N.L.R.B. at 1367.

The Supreme Court has never squarely addressed the propriety of "work acquisition" provisions, particularly where the work the union seeks to acquire is similar to work undertaken by the unit and within the recognized skills of union members. This question was specifically reserved in *National Woodwork Manufacturers Ass'n v. NLRB, supra*, 386 U.S. at 630·31, 87 S.Ct. 1250; *see NLRB v. Enterprise Ass'n of Steam Pipefitters Local 638, supra*, 429 U.S. at 528 n.16; *id.* at 537 n.2, 97 S.Ct. 891 (Brennan, J. dissenting). *See generally* Comment, *Work Recapture Agreements and Secondary Boycotts*, 90 Harv.L.Rev. 815 (1977). Whether this case poses such an issue we need not decide at this time.

sistent with Congress' general scheme for judicial review under the Act to address such complex and important questions of statutory interpretation without the benefit of the agency's expertise in the first instance.[16]

### III.

Should the Board conclude on remand that Steamfitters has claimed only cutting and welding work, it will be necessary for the Board to define more clearly than in its first decision the relevant unit of employees for determining whether the work is fairly claimable by Steamfitters, a central issue in assessing whether a work preservation clause is primary.[17]

If, on the other hand, the Board endorses the interpretation of its prior decision given by its counsel to this court, the Board of course will bear its customary responsibility to base its conclusion on substantial evidence on the record taken as a whole. To facilitate the process of review, and to assure that on remand the Board's decision reflects a careful consideration of the administrative record, the Board should indi-

cate plainly the significance of crucial facts in the record which support the Board's determination of what work Steamfitters in fact claimed under the contract and through its refusal to handle pipe fabricated by Conduit.[18]

The cause is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*

LEVENTHAL, Circuit Judge, dissenting:

I must respectfully disagree with my brethren as to the proper disposition of this case.

Briefly stated, this is a case where the National Labor Relations Board ordered Plumbers and Steamfitters Local 342 (Steamfitters) to cease and desist from its attempts to obtain work that was not fairly claimable and from attempting to enforce that claim by compelling an employer not to deal with a subcontractor.

The Board's opinion contains two themes. One is that the union had claimed not only

---

16. The dissent would accept the interpretation offered by counsel for the Board on appeal, and enforce the order as interpreted. This solution is said to derive from *J. I. Case Co. v. NLRB*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). In *J. I. Case Co.*, however, there was no question as to the meaning of the Board's decision. Rather, the Court was there concerned that "the literal language of the order may well be read in quite different meaning [from the Board's intended decision], especially when separated from findings and standing alone in the Court's enforcement order." *Id.* at 341, 64 S.Ct. at 582. Here the ambiguity infects not only the Board's remedial order, but the decision on which it is based as well. Whatever the propriety of the court amending an order to reflect accurately the Board's decision, we cannot provide a decision that the Board itself failed to articulate.

17. Primary-secondary analysis hinges on a determination of the employee group which the work preservation agreement may legally protect. Unless the relevant unit of employees is clearly established, it is impossible to decide whether a specific job has been customarily or traditionally done by them, or whether it is fairly claimable by them.
*Sheet Metal Workers Local 98 v. NLRB*, 140 U.S.App.D.C. 83, 93, 433 F.2d 1189, 1199 (1970)

(Wright, J., dissenting), *quoted with approval in Sheet Metal Workers Local 223 v. NLRB, supra*, 162 U.S.App.D.C. at 151–52 n.28, 498 F.2d at 693 -94 n.28. While we express no opinion on the appropriate unit on the facts of this case (an issue which "involves questions of fact and policy reserved for the Board," *Lewis v. NLRB*, 122 U.S.App.D.C. 18, 20, 350 F.2d 801, 803 (1965)) typically, the relevant unit for determining whether a work preservation agreement is primary or secondary is all the employees of the members of the multi-employer association covered by the collective bargaining agreement. *See Sheet Metal Workers Local 98 v. NLRB, supra*, 140 U.S.App.D.C. at 93 - 95, 433 F.2d at 1199- 1201 (Wright, J., dissenting).

18. *See Local 627, International Union of Operating Engineers v. NLRB*, 171 U.S.App.D.C. 102, 109 n.14, 518 F.2d 1040, 1047 n.14 (1975), *aff'd in part, vacated in part on other grounds, sub nom. South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 782 (1976), *quoting Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851, *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

the cutting and welding work which it had done in the past, but all of the work involved in fabricating the pipe, which in this particular context included the additional tasks of coating, annealing, and hydrostatic testing. The Board found this work was not fairly claimable. This conclusion was supported by substantial evidence.[1] Moreover, since it is plain that whatever the relevant bargaining unit this work exceeded all historical justifications permissible under the work preservation doctrine,[2] a Board injunction was fully justified. It is on this basis I would affirm.

The other theme of the Board is that even assuming that the union had claimed only cutting and welding, it still would have been in violation of the law.[3] This theme would raise serious legal questions, as the majority notes.[4]

The Board's mandate does not clearly state which of its alternative themes was relied on, and merely prohibits the continuance of the activity found unlawful by the Board. The Board's appellate counsel argues, in support of the Board's order, that it is to be construed narrowly, as prohibiting the claim for complete fabrication. Given this interpretation, the order is one that union counsel stated at oral argument would be acceptable. Obviously, if the order had been expressly limited in this manner, there would have been no appeal.

In these circumstances, it is only common sense to conclude that the narrow interpretation that is being put forward by the Board's counsel, and defines the order in a manner acceptable to the union, should be accepted by the court if it is not unreasonable, and that the case should be affirmed on that basis without further ado.

This common-sense solution is not followed by the majority. Instead, there must be at least one more round of proceedings before this case is finally disposed of. This the majority says, is required in the name of principle, and the common-sense solution cannot be followed because it would mean that the court would be intruding into the domain of the administrative agency.

With all due respect, I submit that good sense does not necessarily mean bad law, and that the common-sense solution is not only congruent with principle, but specifically is in accordance with the approach used by the Supreme Court in *J. I. Case Co. v. NLRB,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). In *Case,* the Court reviewed an order of the NLRB that would have been overbroad unless interpreted as suggested by appellate counsel. The Court accepted that suggested interpretation and modified the Board's order accordingly, 321 U.S. at 341, 64 S.Ct. at 582:

We agree [with the suggested interpretation] but the literal language of the order may well be read in quite different meaning, especially when separated from findings and standing alone in the Court's enforcement order. It then becomes the language of the Court, and the Court would not be bound to look upon the Board's construction as its own. Questions of construction had better be ironed out before enforcement orders issue than upon contempt proceedings. A party is entitled to a definition as exact as the circumstances permit of the acts which he can perform only on pain of contempt of court. Nor should he be ordered to desist from more on the theory that he may violate the literal language and then defend by resort to the Board's construction of it. Court's orders are not to be trifled with, nor should they invite litigation as to their meaning. It will occur often enough when every reasonable effort is made to avoid it. Where, as here, the literal language of the order goes beyond

1. 225 NLRB No. 195, at 6–7 (J.A. 412–13).

2. *See National Woodwork Manufacturers' Ass'n v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

3. 225 NLRB No. 195 at 10 (J.A. 416).

4. Majority opinion at n.15 and related text. If we accept the narrowing construction tendered by the Board's counsel and affirm on that basis, there will be no need for the court to become enmeshed in the complexities of the work preservation doctrine.

what the Board admits was intended, correction should be made.

It bears repetition that the *Case* opinion refers to the submission by appellate counsel as "what the Board admits was intended." [5]

In the exercise of its judicial functions a court may properly accept the narrowing interpretation tendered by agency counsel. This is particularly appropriate in the NLRA enforcement scheme since the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint. *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). We now know that an enforcement proceeding would never have been begun on the basis of a broader interpretation.

In *Case* the Supreme Court also recognized another point, that the power to enforce a NLRB order is equitable in nature; the court grants the relief sought only if consistent with the principles of equity.[6] This adherence to equitable principles is premised on the recognition that an enforcement decree is akin to an injunction—it commands obedience to a specific course of conduct under penalty contempt.[7] Because of the potential for the imposition of the harsh sanction of contempt, the duties prescribed by the judgment of an enforcement court must be specified clearly. *Case, supra*, 321 U.S. at 341, 64 S.Ct. 576. This

doctrine serves to obviate unnecessary intrusion into private activity, to avoid possible deterrence or penalizing of legitimate acts and to maintain respect for judicial decrees.[8]

In exercising its function of determining the form of its enforcement decree, the court takes into account and gives deference to the substantive judgment of the agency. We are not "labor courts"[9] and the Board's findings of fact, if supported by substantial evidence, must be affirmed.[10] Similarly, the enforcement court defers to the Board's choice of the proper remedy,[11] and will refrain from adding new elements to those ordered by the Board.[12]

In sum, the court's function represents a balance between independent responsibility for the form of its enforcement decree and deference to the substantive judgment of the agency.

Contrary to the majority's assertions, affirming the Board's decision on the construction suggested by the Board's counsel does not violate the doctrine of *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Under *Chenery*, an administrative order cannot be upheld "unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." [13] The narrow interpretation presented to us

5. Contrary to the majority's assertions, *Case* is analogous to the instant situation. In *Case* the Court modified the Board's order to conform to what the Board's counsel asserted was the intended interpretation. As the majority recognizes, this procedure was acceptable because the suggested interpretation was supported by the Board's findings of fact. Similarly, the disposition I advocate involves adopting a suggested interpretation that is supported by the Board's findings of fact.

6. *See C–B Buick, Inc. v. NLRB*, 506 F.2d 1086, 1095 (3rd Cir. 1974).

7. Like an injunction, an enforcement decree must satisfy the requirements of Fed.R.Civ.P. 65(d), specifying the appropriate form of an injunctive order. *See, e. g., Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Internat'l Longshoremen's Ass'n Local 1291 v. Phila. Marine Trade*

*Ass'n*, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967).

8. *See* Jaffe, *Judicial Enforcement of Administrative Orders*, 76 Harv.L.Rev. 865 (1963).

9. *Internat'l Bhd. of Teamsters v. NLRB*, 104 U.S.App.D.C. 359, 366, 262 F.2d 456, 463 (1958).

10. 29 U.S.C. § 160(e). *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

11. *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

12. *NLRB v. Food Store Employees Union, Local 347*, 417 U.S. 1, 8, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974).

13. *SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

by agency counsel is a ground "upon which the agency acted." The Board specifically found that Steamfitters attempted to claim the entire fabrication process and that such work was not fairly claimable.[14] It remains a "ground upon which the agency acted," and a valid one, even though the Board made an alternative ruling (of dubious validity) that even if the union had claimed only the limited tasks of cutting and welding the work would still not be fairly claimable.[15]

Accepting the interpretation advanced by the Board's counsel would not violate the rule against *post hoc* rationalizations by agency counsel. That rule is merely a corollary of the *Chenery* doctrine; its purpose is to prevent the courts from deciding discretionary issues that have not been decided by the agency. *Burlington Truck Lines v. U. S.,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). In the case before us, the Board exercised its discretion: it found that the entire fabrication process both had been claimed and was not fairly claimable, and these determinations are supported by substantial evidence and constitute a valid exercise of discretion.

While the NLRB order in this case is not entirely free from ambiguity, the *Case* ruling teaches us that our enforcement function includes 'the authority to tailor that order by adopting a narrow interpretation. I think it entirely reasonable to say that since the Board did not make it clear that it intended a broad injunction, the narrow interpretation tendered by NLRB counsel should be adopted as resolving any ambiguity in a reasonable, sound and proper way. The propriety of this course is underscored by the fact that it is an interpretation that avoids serious doubts as to validity, for under the narrow interpretation the order is valid notwithstanding the failure to define the bargaining unit, whereas under the broader interpretation that failure raises serious questions of validity. The union's counsel does not protest the decree as narrowly construed and this is helpful, although not controlling. The approach advocated by the majority creates unnecessary work, and elevates abstract logic over common sense and good judgment. The court should enforce the Board's order as construed to forbid claims by Steamfitters to the whole task of fabricating lined and coated pipe.

---

**14.** 225 NLRB No. 195 at 6–7 (J.A. 412–13).

**15.** In Judge Friendly's words, *Chenery* stands for the proposition that a reviewing court cannot affirm an agency on a principle the agency might not embrace; it does not require "the tedious process of administrative adjudication and judicial review to be needlessly dragged out while court and agency engage in a nigh endless game of battledore and shuttlecock . . . ." Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke L.J. 199, 205 (1969), quoting *Erie Lackawanna R. R. Co. v. U. S.,* 279 F.Supp. 316, 354–55 (S.D.N.Y., 3-judge court, 1967) *appeal dismissed sub nom. Penn-Central Merger and N & W Inclusion Cases,* 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968).